**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLH TOPCO LLC, *et al.*,[1] | Case No. 25-10576 (CTG) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED
POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL,
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) MODIFIYING THE AUTOMATIC STAY, (IV)
SCHEDULING A FINAL HEARING, (V) GRANTING ADEQUATE
PROTECTION, AND (VI) GRANTING RELATED RELIEF**

The debtors and debtors in possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), by and through their undersigned proposed counsel, hereby move for entry of interim and final orders granting the relief described below. In support of this motion (the "**Motion**"), the Debtors rely on the *Declaration of Leslie Crook in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**")[2] filed concurrently herewith and respectfully represent as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     The Debtors commenced these Chapter 11 Cases to maximize value for their creditors through a going concern sale of their operations as a going concern. This effort relies on postpetition financing to address the Debtors' urgent liquidity needs, including to pay employees, vendors, and other third parties that provide essential services needed to operate the Debtors'

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: BLH TopCo LLC (9009); BLH HoldCo LLC (7735); BLH Acquisition Co., LLC (5779); BLH Restaurant Franchises LLC (8093); and BLH White Marsh LLC (2950). The Debtors' mailing address is 15305 Dallas Parkway, 12th Floor, Addison, TX 75001.

[2]  Capitalized terms used but not defined herein have the meanings ascribed in the First Day Declaration.

restaurants. As such, the Debtors seek authority to obtain new funding and use cash collateral pursuant to the DIP Credit Agreement substantially in the form attached hereto as **Exhibit A**, and the DIP Facility (as such terms are defined below); the proposed interim order attached hereto as **Exhibit B** (the "**Interim Order**"); and a proposed final order to be filed in these cases (the "**Final Order**"). Immediate access to the DIP Facility and the use of cash collateral will ensure that the Debtors have sufficient liquidity to pay their ordinary course operating expenses and the costs of these Chapter 11 Cases. The DIP Facility constitutes a sound exercise of the Debtors' business judgment and will enable the Debtors to maximize value for the estates. As a result, the Debtors respectfully request that the Court grant the relief requested.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent such consent, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are §§ 105(a), 363, and 503(b) of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"), and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

**RELIEF REQUESTED**

5.      By this Motion, the Debtors seek entry of the Interim Order and a Final Order

(collectively, the "**Orders**"):

- authorizing the Debtors, as borrowers (the "**Borrowers**" or "**DIP Loan Parties**") to obtain postpetition financing pursuant to a senior secured, superpriority, priming, debtor-in-possession, multiple-draw facility (the "**DIP Facility**") subject to the terms and conditions set forth in the Orders and that certain *Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among the Borrowers and Bar Louie LLC (together with its successors and permitted assigns, the "**DIP Lender**"), consisting of (i) a multiple-draw, new money term loan credit facility (the "**New Money DIP Loans**") in an aggregate principal amount of up to $1,350,000 million, of which will be made available to be drawn upon entry of the Interim Order, and (ii) a "roll-up" of $1,125,000 million (the "**Roll Up DIP Loans**") of Prepetition Loans (as defined below) on a cashless, dollar-for-dollar basis into loans under the DIP Facility (the loans to be made available under the foregoing clauses (i) and (ii), the "**DIP Loans**");

- authorizing the DIP Loan Parties to execute, deliver and perform under the DIP Credit Agreement and all other documents and instruments that may be reasonably requested by the DIP Lender in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof the "**DIP Documents**");

- authorizing the Borrowers to incur debt under the DIP Documents, including all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees), costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) earned, due and payable under the DIP Documents (as defined below) (collectively, the "**DIP Obligations**"), in each case in accordance with the terms of the Interim Order and the DIP Documents;

- subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth in the Interim Order, granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Lender, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms set forth in the Interim Order;

- authorizing the DIP Lender to take all commercially reasonable actions to implement the terms of the Interim Order;

- waiving upon entry of the Final Order, (a) the Debtors' right to surcharge the DIP Collateral and the Prepetition Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 522(b) of the Bankruptcy Code;

- waiving, upon entry of the Final Order, the equitable doctrine of "marshaling" and other similar doctrines for the benefit of the DIP Lender with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations (each as defined below), as applicable in each case subject to the Carve-Out;

- authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the DIP Orders and the DIP Documents (including the Budget, subject to Permitted Variances);

- authorizing the Debtors to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date), of the DIP Lender, and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the DIP Lender or DIP Collateral (as defined below) ("Cash Collateral");

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the DIP Lender for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "Diminution in Value");

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order, and, upon entry, the Final Order; and

- scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility on the terms of the Final Order.

**Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**

6.      The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Summary of Material Terms[3] | |
|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | BLH TopCo LLC<br>BLH HoldCo LLC<br>BLH Acquisition Co., LLC<br>BLH Restaurant Franchises LLC<br>BLH White Marsh LLC<br><br>*See* DIP Credit Agreement at 1, ¶ 1.01. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Bar Louie LLC<br><br>*See* DIP Credit Agreement at 1, ¶ 1.01. |
| **Term**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The DIP Facility shall mature on the earlier of (any such date, the "**Maturity Date**"): (a) the earlier of one business day after confirmation of a plan in these cases of 120 days after the Petition Date; (b) date upon which the Interim Order expires if the Final Order has not been entered no later than [35 days] after the Petition Date; (c) the conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; (d) the consummation of the sale of all or substantially all of the assets of the Borrowers, taken as a whole, pursuant to section 363 of the Bankruptcy Code; and (e) the date of the acceleration of the DIP Facility and termination of lending commitments.<br><br>*See* DIP Credit Agreement at 12, ¶ 1.04. |
| **Commitments** | The New Money DIP Loan will be available by multiple draws in an aggregate principal amount of up to $1,350,000 million. Subject to the conditions set forth in "Conditions to Effectiveness" and "Funding Conditions" in the DIP Credit |

---

[3]  The summaries contained in this table are qualified in their entirety by the provisions of the DIP Credit Agreement and the proposed Interim Order, as applicable. To the extent of any inconsistency, the terms of the DIP Credit Agreement or the Interim Order shall control, as applicable.

| Summary of Material Terms[3] | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Agreement, (i) the amount of the New Money DIP Loans to be available following entry of the Interim Order by the Court shall be up to $1,350,000 million and (ii) subject to the entry of the Final Order, the balance of the New Money DIP Loans will be made available to the Borrower.<br><br>*See* DIP Credit Agreement at ¶ 5.02. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Loans under the DIP Facility will bear interest at a rate of 12.5% simple interest per annum. At any time when an Event of Default under the DIP Facility has occurred and is continuing, outstanding amounts under the DIP Facility shall bear additional interest at the rate of 4% per annum.<br><br>*See* DIP Credit Agreement at ¶ 2.05. |
| **Use of DIP Facility**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the New Money DIP Loans will be used to provide liquidity for the Debtors throughout the Chapter 11 Cases solely in accordance with (i) the DIP Credit Agreement and (ii) the Budget approved by the Lender.<br><br>*See* DIP Credit Agreement ¶ 7.09. |
| **"Roll Up" Provisions**<br><br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Interim Order by the Court, a roll-up of $1,125,000 million **Roll Up DIP Loan**") of the loans under the Prepetition Credit Agreement on a cashless dollar-for-dollar basis into loans under the DIP<br><br>*See* DIP Credit Agreement ¶ 2.01(a). |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any diminution in value of the DIP Lender's interest in the Prepetition Collateral and the use of the Prepetition Collateral, including the Cash Collateral, the DIP Lender shall receive the adequate protection provided in the Interim Order, which consists of valid and nonavoidable postpetition security interests in and liens on all of the Debtors' property and assets, whether now existing or hereafter arising and wherever located, with any such lien junior to the liens securing the DIP Obligations, the Carve-Out, and any valid, perfected, and unavoidable liens in existence as of the Petition Date. The DIP Lender will also receive a superpriority administrative claim in each of the Chapter 11 Cases.<br><br>*See* Interim Order at ¶ 8. |

| Summary of Material Terms[3] | |
|---|---|
| **Mandatory Prepayments**<br><br>Local Rule 4001-2(a)(i)(E) | Customary conditions for mandatory prepayments on facilities of this type and purpose, including but not limited to:<br><br>Upon receiving the Net Cash Proceeds from any Disposition or Involuntary Disposition consummated on or after the Petition Date, the Borrowers must prepay the Loans within three Business Days after realizing or receiving such Net Cash Proceeds. The prepayment amount must equal 100% of the Net Cash Proceeds from the Disposition or Involuntary Disposition and must include all interest on the prepaid principal amount through the prepayment date.<br><br>Upon receiving the Net Cash Proceeds from either any Debt Issuance not permitted under the Agreement or the sale or issuance of any of the Borrowers' Equity Interests (excluding sales or issuances to another Borrower), the Borrowers must prepay the Loans within three Business Days after realizing or receiving such Net Cash Proceeds. The prepayment amount must be equal to 100% of the Net Cash Proceeds from the Debt Issuance or Equity Interests sale or issuance and must include all interest on the prepaid principal amount through the prepayment date.<br><br>Any mandatory prepayment must occur on or before the third Business Day following the realization or receipt of the Net Cash Proceeds by the Borrowers. The Borrowers must notify the Lender in writing of any mandatory prepayment of Loans. The Lender must receive this notification no later than 12:00 p.m. on the Business Day before the prepayment date. Each notice must specify the prepayment date and include a reasonably detailed calculation of the total prepayment amount.<br><br>*See* DIP Credit Agreement ¶ 2.03(b). |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The DIP Facility does not provide for any commitment or exit fees. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Borrowers may use the Loan proceeds and credit accommodations provided in this Agreement and the DIP Loan Documents only in accordance with the Budget and the DIP Order. However, nothing in the Budget constitutes an amendment or modification of any DIP Loan Document or any Borrowing restrictions or lending limits set forth in this Agreement or in the DIP Order.<br><br>The Lender may assume that the Borrowers will comply with the Budget and has no duty to monitor such compliance. |

| Summary of Material Terms[3] | |
|---|---|
| | The Lender is not required to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Budget or unpaid expenses that the Borrowers may have failed to include in the Budget.<br><br>The line items in the Budget for payment of interest, expenses, and other amounts to the Lender are estimates only. The Borrowers remain obligated to pay any and all DIP Obligations in accordance with the terms of the DIP Loan Documents and the DIP Order, regardless of whether such amounts exceed the estimates.<br><br>*See* DIP Credit Agreement ¶ 7.09. |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Each line item in the Budget is subject to a permitted negative variance of (i) 15% per week above the projected aggregate disbursements set forth in the Budget, and (ii) 15% per four-week period, then ending, on the revenue set forth in the Budget.<br><br>Any unused amounts in the Budget during any one-week period may be carried forward to future weekly periods. These carried-forward amounts may be applied to any excess expenditures in the same line item relative to the projected line as set forth in the Budget, such that the cumulative-to-date budgeted amount for each line item is available without causing future weekly periods to exceed the allowable variance. Each line item in the Budget is subject to a maximum amount for each particular week, as specified in the Budget.<br><br>*See* DIP Credit Agreement ¶ 8.04. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Borrowers fail to pay any amounts when due, as required by this Agreement or any other Loan Document, including principal of any Loan, interest on any Loan, premiums, fees, or any other amounts payable.<br><br>The Borrowers fail to perform or observe: (i) any term, covenant, or agreement contained in any DIP Loan Documents, *provided that* such failure has not has not been remedied or waived within five Business Days after the Borrowers receive written notice from the Lender; or (ii) any term, covenant, or agreement contained in Article VII (Affirmative Covenants) or Article VIII (Negative Covenants) of this Agreement.<br><br>A Milestone under Section 7.01 is not met. The Parties acknowledge that the failure to meet any Milestone may be waived by the Lender at its sole and absolute discretion but, notwithstanding anything to the contrary herein, is not subject to remedy or cure by the Borrowers.<br><br>Any representation, warranty, certification, or statement of fact made or |

| Summary of Material Terms[3] |
| --- |
| deemed made by or on behalf of the Borrowers in the DIP Loan Documents or in any other document delivered in connection with the DIP Loan Documents is incorrect or misleading. A representation, warranty, certification, or statement of fact is considered incorrect or misleading if (i) it is expressly qualified by materiality or pertains to the occurrence or non-occurrence of a Material Adverse Event and is incorrect or misleading in any respect when made or deemed made; or (ii) it is not expressly qualified by materiality and does not pertain to a Material Adverse Event and is incorrect or misleading in any material respect when made or deemed made.<br><br>A Material Adverse Event occurs or is reasonably likely to occur or the Borrowers fail to provide timely notice to the Lender of any Material Adverse Event as required under this Agreement.<br><br>The Borrowers fail to comply with the Budget, subject to the permitted variances as set forth in the Agreement. For the avoidance of doubt, an Event of Default shall occur if the Borrowers exceed the permitted negative variance of (i) 15% per week above the projected aggregate disbursements set forth in the Budget, or (ii) 15% per four-week period on the revenue set forth in the Budget."<br><br>After execution and delivery, any DIP Loan Document ceases to be in full force and effect for any reason other than as expressly permitted therein or upon full satisfaction of all DIP Obligations.<br><br>Any Borrower contests the validity or enforceability of any DIP Loan Document or purports or attempts to revoke, terminate, or rescind any DIP Loan Document.<br><br>A Borrower files a motion seeking an order impairing the DIP Collateral or if such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.<br><br>Any Entity files or supports a motion, application, or adversary proceeding or challenging or otherwise contests the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Prepetition Loan Documents or Prepetition Obligations or asserts any other cause of action against the Lender with respect or relating to such claims or the prepetition liens securing such claims.<br><br>After its entry, the DIP Order (for any reason other than pursuant to its terms) ceases to create a valid and perfected Lien with security interests in all DIP Collateral with the priority specified therein, subject to |

| Summary of Material Terms[3] |
|---|

Permitted Liens under the terms of the Agreement.

The Bankruptcy Court enters an order without the Lender's express prior written consent that: (a) revokes, reverses, stays, modifies, supplements, or amends any of the DIP Orders, (b) permits any administrative expense or claim (existing now or arising in the future, of any kind or nature) to have administrative priority over or equal to the Lender's priority concerning the DIP Obligations, or (c) grants or permits the grant of a Lien on the DIP Collateral other than a Permitted Lien.

A motion is filed seeking an order authorizing the use of cash collateral without the Lender's prior written consent.

A motion is filed seeking an order authorizing the use of DIP Collateral, or financing or loans secured by liens that are senior, *pari passu*, or junior to the Lender's Liens on DIP Collateral, without the Lender's prior written consent.

Either: (x) one or more final judgments or orders for the payment of money in an aggregate amount exceeding $50,000, to the extent not covered (subject to normal deductibles) by independent third-party insurance as to which the insurer does not dispute coverage or (y) one or more non-monetary final judgments that have, or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Event, are entered against any Borrower; and

There is a period of 30 consecutive days during which either (x) Enforcement proceedings are commenced by any creditor upon such judgment or order, and such proceedings remain unstayed or undismissed; or (y) a stay of enforcement of such judgment, by reason of a pending appeal, the Chapter 11 Cases, or otherwise, is not in effect.

With respect to any Indebtedness or Guarantee (other than Indebtedness under this Agreement) with an aggregate principal amount exceeding $50,000, except to the extent a payment obligation is stayed or excused under the Bankruptcy Code or is subject to a good faith dispute:

The Borrowers fail to make any payment when due, beyond any applicable grace period. This includes undrawn committed or available amounts and amounts owed to all creditors under any combined or syndicated credit arrangement.

The Borrowers fail to observe or perform any other agreement or

| Summary of Material Terms[3] |
|---|

|  | condition related to such Indebtedness or Guarantee, or contained in any instrument or agreement evidencing, securing, or relating to it.

Any other event occurs that causes, or permits the holder(s) of such Indebtedness or the beneficiary(ies) of such Guarantee (or a trustee or agent on their behalf) to demand, or cause the Indebtedness to become due, be repurchased, prepaid, defeased, or redeemed (automatically or otherwise), or to make an offer to repurchase, prepay, defease, or redeem such Indebtedness before its stated maturity, with the giving of notice if required.

The Bankruptcy Court enters an order that grants relief from the Automatic Stay to any creditor of any Borrower for any claim equal to or exceeding $50,000 and which is not stayed pending appeal.

Any Borrower engages in any of the following actions: (i) Institutes or consents to the institution of any proceeding under any Debtor Relief Law (other than the Chapter 11 Cases); (ii) makes an assignment for the benefit of creditors; or (iii) applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer for itself or for all or any material part of its assets.

Any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer is appointed without the application or consent of a Borrower, and the appointment continues undischarged or unstayed for 60 calendar days.

Any proceeding under any Debtor Relief Law relating to a Borrower or to all or any material part of its assets is instituted without the consent of a Borrower, and the proceeding continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding.

A Borrower files a motion seeking an order appointing a trustee or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.

The Bankruptcy Court enters an order appointing, or any Borrower files an application for an order seeking the appointment of, either a trustee pursuant to Bankruptcy Code section 1104 or an examiner or other responsible Person or officer with enlarged powers under Bankruptcy Code section 1106(b) beyond those specified in Bankruptcy Code section 1106(a)(3) and (4), particularly relating to the operation of the Business.

A Borrower files a motion seeking an order converting a Chapter 11 Case |

| Summary of Material Terms[3] | |
|---|---|
| | to a case under Chapter 7 or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith. |
| | The Bankruptcy Court enters an order converting any Chapter 11 Case to a chapter 7 case. |
| | A Borrower files a motion seeking an order appointing a trustee or dismissing a Chapter 11 Case or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith. |
| | The Bankruptcy Court enters an order dismissing any of the Chapter 11 Cases without including provisions that terminate the New Money DIP Commitments and ensure full payment, in cash, of all DIP Obligations upon entry of such order. |
| | The Bankruptcy Court confirms a Plan that does not provide for the continuation of the Liens and security interests granted to the Lender under this Agreement until the Plan's Effective Date and the termination of the New Money DIP Commitments and the indefeasible payment in full, in cash, of all DIP Obligations and Prepetition Obligations on or before the Plan's Effective Date. |
| | *See* DIP Credit Agreement ¶ 9.01. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrowers agree to indemnify and defend the Lender and its Related Parties (each, an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of outside counsel for the Indemnitees, including one local counsel, as applicable, in any relevant jurisdiction and any specialty counsel, as applicable, for each relevant specialty and, in the case of actual or potential conflict of interest (as determined by such Indemnitee), separate counsel for Indemnitees to the extent needed to avoid such conflict), incurred by any Indemnitee or asserted against any Indemnitee arising out of, in connection with, or as a result of, (i) the execution or delivery of this Agreement or any other DIP Loan Document, the performance by the Parties of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of the DIP Loan Documents; (ii) any Loan or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged Release of Hazardous Materials at, on, under or from any assets owned, leased or operated by a Borrower, or any Environmental Liability related in any way to a Borrower or its respective facilities and/or assets; or (iv) any actual or prospective claim, litigation, investigation or proceeding |

| Summary of Material Terms[3] | |
|---|---|
| | relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity  not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the actual fraud, gross negligence, bad faith or willful misconduct of such Indemnitee.<br><br>*See* DIP Credit Agreement ¶ 10.4 (b). |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Borrowers must meet the following Milestones, unless extended or waived by the Lender at its sole and absolute discretion. (The Parties acknowledge that certain of the Milestones are subject to the Court's availability. If any Milestone cannot be met due to the Court's unavailability, that Milestone may be automatically extended by up to three Business Days, with corresponding extensions for subsequent Milestones).<br><br>Each Borrower must file a chapter 11 petition in the Bankruptcy Court no later than the **March 26, 2025** (the "**Petition Date**").<br><br>By no later than **March 27, 2025**, the Borrowers must file a motion seeking approval of the DIP Orders in form and substance acceptable to the Lender in all respects.<br><br>By no later than **28 days after Petition Date**, the Borrowers must have filed, in form and substance acceptable to the DIP Lender at its absolute discretion, a Plan and Disclosure Statement and a motion seeking, among other things: (i) conditional approval of the Disclosure Statement; and (ii) a joint hearing for the Court to consider final approval of the Disclosure Statement and confirmation of the Plan.<br><br>By no later than the **5 days following the Petition Date**, the Bankruptcy Court must have entered the Interim DIP Order, in form and substance acceptable to the Lender in all respects, approving the New Money DIP Loan and the Roll Up DIP Loan on an interim basis, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.<br><br>By no later than **35 days following the Petition Date**, the Bankruptcy Court must have entered the Final Order, in form and substance acceptable to the Lender in all respects, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.<br><br>By no later than **90 days after the Petition Date**, the Bankruptcy Court must have entered an order, in form and substance acceptable to the DIP Lender in |

| Summary of Material Terms[3] | |
|---|---|
| | all respects, confirming the Plan and Disclosure Statement, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.<br><br>By no later than **120 days after the Petition Date**, the effective date of the Plan must have occurred.<br><br>*See* DIP Credit Agreement ¶ 7.01. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | Bar Louie LLC, *i.e.*, the DIP Lender. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | The Interim DIP Order provides for a Carve Out from the DIP Lender's collateral that includes of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time and consistent with the Budget, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount of $100,000 for Debtor Professionals and $15,000 for the Committee Professionals incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default in connection with the issuance of a Termination Declaration and acceleration of the DIP |

| Summary of Material Terms[3] | |
|---|---|
| | Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. *See* DIP Credit Agreement at 5-6, Interim Order ¶ 28. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Upon the entry of the Interim Order and subject to its terms, the DIP Obligations will be secured by a valid and perfected lien on all of the Debtors property and assets, subject to the Carve-Out, with priority pursuant to sections 361, 362, 364(c)(2) and 364(c)(3) on an interim basis and pursuant to 364(d) on a final basis upon entry of the Final Order.<br><br>*See* DIP Credit Agreement ¶ 3.01; Interim Order ¶ 5.<br><br>Upon the entry of the Interim Order and subject to its terms, the DIP Liens will be secured by valid and fully-perfected, first-priority, priming Liens on all of the DIP Collateral subject only to the Carve-Out.<br><br>*See* DIP Credit Agreement ¶ 6.015; Interim Order ¶ 6. |
| **506(c) Waiver; Section 552(b)**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x); 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(C); 4001-2(a)(i)(h) | *Subject to and effective upon the entry of the DIP Order and subject to its terms, without the Lender's prior written consent and except to the extent of the Carve-Out: (i) no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, may be charged against or recovered from the DIP Collateral pursuant to either Bankruptcy Code section 105 or 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, or any other legal or equitable doctrine (including unjust enrichment) or similar principle of law; and (ii) in no event will the Lender be subject to surcharge under Bankruptcy Code section 506(b), the "equities of the case" exception contained in Bankruptcy Code section 552(b), the equitable doctrine of "marshaling," or any similar doctrine with respect to the DIP Collateral.*<br><br>*See* DIP Credit Agreement ¶ 6.15(f); Interim Order ¶¶ 5, 6. |
| **No Marshaling**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x); 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(C); | Upon the entry of the DIP Order and subject to its terms, in no event shall the Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to Lender's collateral, including, without limitation, the DIP Collateral.<br><br>*See* DIP Credit Agreement ¶ 6.15(f) |

| Summary of Material Terms[3] | |
| --- | --- |
| 4001-2(a)(i)(h) | |
| **Stipulations to Prepetition Liens and Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule<br>4001-2(a)(i)(B) | The Debtors admit, stipulate, acknowledge, and agree that the Debtors' obligations under the Prepetition Credit Agreement and the security interests granted thereunder in favor of the Prepetition Lender on the Debtors' assets to secure the Prepetition Obligations are (a) valid, enforceable, and perfected first-priority security interests in and continuing liens upon such assets, (b) not subject to offset, deduction, claim, counterclaim, or defense of any kind, nature, or description whatsoever.<br><br>*See* Interim Order at ¶¶ J, 16. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule<br>4001-2(a)(i)(B) | The Debtors' stipulations shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, in all circumstances and for all purposes, subject only to challenge by adversary proceeding validly brought and commenced no later than 75 days after entry of the Interim Order.<br><br>*See* Interim Order at ¶ 16. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors to take all actions as are necessary or appropriate to implement the terms of the Interim Order. The automatic stay shall be modified to the extent necessary to permit the DIP Lender to take any action authorized by the Interim Order.<br><br>*See* Interim Order ¶ 13. |

## BACKGROUND

### I.    CHAPTER 11 CASES

7.    On March 26, 2025 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, and have filed a motion requesting joint administration of these chapter 11

cases pursuant to Bankruptcy Rule 1015(b).  No trustee, examiner, or official committee of unsecured creditors has been appointed in these chapter 11 cases.

8.      Debtors are operators and franchisors of locally themed, social gastrobars under the "Bar Louie" brand.  Bar Louie gastobars deliver a comfortable, urban atmosphere known for its signature, hand-crafted cocktails made from fresh fruit and hand-squeezed juices and with an extensive selection of traditionally and regionally inspired American food, including shareable plates, burgers and sandwiches.  Additional information regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in the First Day Declaration and is incorporated herein by reference.

9.      The Debtors commenced these cases to effect a going concern sale after an unsuccessful prepetition sales process and after substantial operational restructuring efforts.  The Debtors believe that a sale of substantially all of their assets as a going concern will deliver a value-maximizing result for their estates, creditors and other stakeholders. Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in the First Day Declaration and incorporated herein by reference.

## II.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND NEED FOR THE DIP FACILITY

### A.    Prepetition Capital Structure

10.     As of the Petition Date, the Debtors are obligated to the DIP Lender for not less than $69,573,827.88 pursuant to that certain Credit Agreement dated as of May 27, 2020 (as amended and restated from time to time, the "**Prepetition Credit Agreement**"), which obligations are secured by senior security interests in and liens on substantially all assets of the Debtors.  All Debtors BLH HoldCo, LLC, BLH Acquisition Co., LLC, and BLH Restaurant Franchises, LLC

are the obligors under the Prepetition Credit Agreement. All of the Debtors' funded debt obligations as of the Petition Date arise under the Prepetition Credit Agreement and are secured by security interests in and liens on all or substantially all of their assets.  DIP Lender acquired the entirety of the agent and lender positions from the prior holders on or about February 18, 2025.

        **B.**      **Alternative Sources of Financing Are Not Readily Available**

11.     As further described in the First Day Declaration, despite the reduction of pandemic-era restrictions impacting the restaurant industry, the Debtors have struggled financially in the face of additional macroeconomic headwinds.  Many of the stores that the Debtors believed would bounce back after the pandemic have underperformed and have caused a drag on the Debtors' financial performance.  The Debtors have incurred net losses and negative earnings before interest, taxes, and depreciation (EBITDA) in recent years, have been forced to seek amendments of the Prepetition Credit Agreements to address ongoing covenant defaults, and have had to borrow funds the Prepetition Credit Agreement to fund operating losses.

12.     The Debtors require new funding and access to cash collateral to ensure sufficient working capital to operate their businesses and administer their estates. The liquidity needs include payments to employees, third-party vendors, landlords, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets.

13.     The Debtors commenced discussions with the DIP Lender for a postpetition financing facility and the consensual use of cash collateral.  In addition, the Debtors solicited third-party lenders for postpetition financing to assess the availability of such financing and confirm appropriate terms for the Debtors to continue to operate and administer these Chapter 11 Cases. This process did not result in any actionable alternative sources of financing.  Based thereon, and

as further described in the First Day Declaration, the Debtors believe that the DIP Facility presents the best financing proposal currently available to the Debtors.

## BASIS FOR RELIEF REQUESTED

### III.   THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP LOAN DOCUMENTS

#### A.   Entry Into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment

14.     Section 364 of the Bankruptcy Code authorizes the Debtors to obtain secured or superpriority postpetition financing.  Courts grant a debtor's business judgment considerable deference in obtaining postpetition secured credit provided the terms of such credit do not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

15.     To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *See In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves a "business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the Code").  The Court should evaluate the soundness of a debtor's business judgment, "in context,

and considering the relative circumstances of the parties." *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP Lender. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

16.    The DIP Facility is a sound exercise of the Debtors' business judgment. The DIP Facility is necessary to fund the Debtors' postpetition operations and ensure that ordinary course administrative expenses are paid current. The DIP Facility will provide the Debtors with adequate liquidity needed to execute the proposed sale process and maximize value for all stakeholders. Moreover, the Debtors and the DIP Lender negotiated the DIP Documents in good faith, at arm's length, and with the assistance of their respective advisors. The interest rates and the Roll Up DIP Loans are integral components of the overall package demanded by the DIP Lender as consideration for the extension of the DIP Facility. The Debtors, in consultation with their advisors, determined that the proposed DIP Facility presents the best financing proposal currently available to the Debtors. *See* First Day Decl. at ¶ 17. Thus, the terms of the DIP Facility reflect a sound exercise of the Debtors' business judgment and the Debtors should be authorized to enter into the DIP Documents and obtain the DIP Facility on the terms set forth herein and in the proposed Interim Order.

**B.** **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

17.     The Debtors propose to grant superpriority claims and liens described herein and in the Interim Order pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.   More specifically, the Debtors propose to provide to the DIP Lender, subject to the Carve-Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens upon, all tangible prepetition and postpetition property of the Debtors.   The prepetition liens of the DIP Lender shall be primed and made subject and subordinate to the DIP Liens.

18.     In the event a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.,* by allowing a lender only an administrative claim;

   b.     the credit transaction is necessary to preserve the assets of the estate;

   c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC,* 457

B.R. at 312-13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37-40 (Bankr. S.D.N.Y.

1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

19.     As described above and in the First Day Declaration, the Debtors are unable to

obtain junior, let alone unsecured, credit.  Indeed, the Debtors did not receive any actionable DIP

financing proposals other than the DIP Facility from the DIP Lender.

20.     Absent the DIP Facility, which will provide sufficient liquidity to administer these

cases and execute the Debtors' sale process, the value of the Debtors' estates would be significantly

impaired to the detriment of all stakeholders.  Given the circumstances, the Debtors believe that

the terms of the DIP Facility, as set forth in the DIP Documents, are fair and reasonable.  For these

reasons, the Debtor have met the standard to obtain postpetition financing under section 364(c) of

the Bankruptcy Code.

21.     If a debtor is unable to obtain unsecured credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code

provides that a court may:

> Authorize the obtaining of credit or the incurring of debt (1) with priority over any
> or all administrative expenses of the kind specified in section 503(b) or 507(b) of
> [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not
> otherwise subject to a lien; or (3) secured by a junior lien on property of the estate
> that is subject to a lien.

11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit.

Accordingly, approving superpriority claims in favor of the DIP Lender is reasonable and

appropriate.

22.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit

secured by a senior or equal lien on property of the estate already subject to a lien, after notice and

a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate

protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(c). The Court may authorize the "priming" liens proposed in the Motion if either (a) the prepetition secured parties have consented or (b) the prepetition secured parties' interests in their respective collateral are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

23.      Here, the DIP Lender, whose prepetition liens will be primed by the DIP Liens, has consented on the terms described herein and set forth in the proposed Interim Order. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.    Alternatives to the DIP Facility Are Inferior

24.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *See In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987.) If only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1989); *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co., Inc.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met);

*Ames Dep't Stores,* 115 B.R. at 37-39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

25.     The Debtors' prepetition marketing process demonstrated that actionable alternative sources of financing are not available. *See* First Day Decl. at ¶ 17. The Debtors and their advisors canvassed the distressed financing market for alternative postpetition proposals and did not receive any other actionable financing proposals. Accordingly, the DIP Facility offered by the DIP Lender represents the Debtors' best available option to meet the Debtors' urgent liquidity needs and to successfully finance these cases. *See id.* The DIP Facility will allow the Debtors to smoothly transition into chapter 11, where they and their advisors intend to conduct an orderly sale process for the Debtors' assets. *See* First Day Decl. at ¶ 19. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### D.     The Roll Up DIP Loan is Appropriate

26.     The DIP Credit Agreement provides that (i) upon the entry of the Interim Order, the Roll Up DIP Loan of $1,125,000 of obligations under the Prepetition Facility shall be deemed to "roll-up" on a cashless dollar-for-dollar basis for the DIP Loans.

27.     The proposed Roll Up DIP Loan is an appropriate exercise of the Debtors' business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  *See* 11 U.S.C. § 363(b). It is well-settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.,* 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's

management from judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

28.     DIP facilities commonly include provisions repaying prepetition debt (often referred to as a "roll-up"). The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to that requested herein. *See, e.g., In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jul. 31, 2023) (authorizing an approximately $63 million DIP Facility, including an approximately $43 million roll-up); *In re Si02 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jul. 20, 2020) (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order).

29.     As demonstrated in the First Day Declaration, the Debtors cannot fund these cases absent the liquidity provided by the DIP Facility. The Debtors received no other actionable financing proposals.  Accordingly, the Debtors believe that obtaining credit under the DIP Facility, even with the Roll Up DIP Loan, constitutes a proper exercise of their business judgment and is in the best interest of their estates.

30.     Moreover, the Roll Up DIP Loan is a material component of the consideration required by the DIP Lender as part of its commitment to provide postpetition financing. *See* First Day Decl. at ¶ 21.  The Roll Up DIP Loan is reasonable, appropriate, a proper exercise of the Debtors' business judgment, and ultimately in the best interest of their estates.

### E.     The Debtors Should Be Authorized to Use Cash Collateral and Provide Adequate Protection

31.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including cash collateral.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2).  Here, the DIP Lender has consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

32.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Switzerland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what

constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

33.    As set forth in the Interim Order, the Debtors proposed to provide the DIP Lenders with certain forms of adequate protection to protect against the postpetition diminution in value of their Prepetition Collateral (collectively, the "**Adequate Protection**"). These protections are set forth in the Interim Order.

34.    The proposed Adequate Protection is sufficient to protect the DIP Lender from any potential diminution in value to their Prepetition Collateral, including Cash Collateral. In light of the foregoing, the Debtors submit, and the DIP Lender agrees, that the proposed Adequate Protection is appropriate.  Thus, the Adequate Protection provision is fair and appropriate under the circumstances to ensure that the Debtors are able to continue using Prepetition Collateral, including Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and the Debtors' estates.

## IV.    THE DIP LENDER SHOULD BE DEEMED A GOOD FAITH LENDER UNDER SECTION 364(e) OF THE BANKRUPTCY CODE

35.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor in possession, and any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or

any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

36.     As explained herein and in the First Day Declaration, the proposed DIP Facility is the result of: (i) the Debtors' reasonable and informed determination that it represents the best postpetition financing available under the circumstances and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lender.  The proceeds of the DIP Facility will be used only for purposes permissible under the Bankruptcy Code.  Accordingly, the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded thereunder.

## V.    THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

37.     The proposed Interim Order provides that the automatic stay in effect under section 362 of the Bankruptcy Code will be modified to (i) implement the terms of the Interim Order and (ii) allow the DIP Lender and DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to perfect the respective liens granted to them under the DIP Documents.  In addition, the proposed Interim Order provides that the automatic stay will be modified to the extent necessary to permit the DIP Lender to exercise certain remedies upon the occurrence of an event of default under the DIP Documents—subject to the procedures set forth in the Interim Order.  The Debtors believe that these provisions were required to obtain the DIP Facilities and consensual use of Cash Collateral as provided in the Interim Order.

38.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these cases. *See, e.g., In re SiO2 Medical Prods., Inc.,* No. 23-10366

(JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Extraction Oil & Gas, Inc.,* No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).

## VI.    FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO THE DIP FACILITY WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM

39.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after service of such motion. However, upon request, the Court may conduct a preliminary, expedited hearing on the motion and authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the estate.

40.    For the reasons described above and in the First Day Declaration, the Debtors have a critical and immediate need for the liquidity provided by the DIP Facility and access to Cash Collateral.  *See* First Day Decl. at ¶ 17.  The DIP Facility and Cash Collateral are necessary to fund the Debtors' orderly wind-down of operations and to execute the value-maximizing sale process. *See id.* at ¶ 19. Cash Collateral will supplement the cash infused by the DIP Facility to ensure that these Chapter 11 Cases are sufficiently funded.

41.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates pending the Final Hearing.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

42.      To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As set forth above, the relief requested herein is needed to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and efforts to pursue a successful resolution to these cases.

## NOTICE

43.      The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the attorney generals for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) counsel for the DIP Lender; (f) the holders of the 30 largest claims against the Debtors on a consolidated basis; and (g) all parties requesting notice in these cases.  Notice of this Motion and any order entered on this Motion will be served as required by Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim Order

substantially in the form attached hereto, (ii) schedule the Final Hearing, (iii) after the Final Hearing,

enter the Final Order, and (iv) grant such further relief as may be just and proper.

Dated:  March 27, 2025
       Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

*/s/ Thomas J. Francella, Jr.*
Thomas J. Francella, Jr. (No. 3835)
Mark W. Eckard (No. 4542)
824 North Market Street, Suite 805
Wilmington, DE 19801
(302) 772-5803
tfrancella@raineslaw.com
meckard@raineslaw.com

*Proposed Counsel to the Debtors and Debtors in
Possession*