## EXHIBIT A

**DIP Credit Agreement**

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AND SECURITY AGREEMENT**

Dated as of March 27, 2025

among

**BLH TOPCO LLC,
BLH HOLDCO LLC,
BLH ACQUISITION CO., LLC,
BLH RESTAURANT FRANCHISES LLC, and
BLH WHITE MARSH LLC**,
as Borrowers,

and

**BAR LOUIE LLC**,
as Lender

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT is entered into as of March 26, 2025, among BLH TOPCO LLC, a Delaware limited liability company, BLH HOLDCO LLC, a Delaware limited liability company, BLH ACQUISITION CO., LLC., a Delaware limited liability company, BLH RESTAURANT FRANCHISES LLC, a Delaware limited liability company, and BLH WHITE MARSH LLC, a Maryland limited liability company (collectively, the "**Borrowers**") and BAR LOUIE LLC, a Delaware limited liability company, as lender (together with its successors and assigns, the "**Lender**").

### RECITALS

**WHEREAS**, on the Petition Date, the Borrowers commenced Chapter 11 Cases in the Bankruptcy Court and have retained possession of their respective properties and are authorized under the Bankruptcy Code to continue operating their Business as debtors and debtors in possession; and

**WHEREAS**, before the Petition Date, the Lender provided financing to the Prepetition Credit Parties under the Prepetition Credit Agreement.

**WHEREAS**, pursuant to and in connection with the Prepetition Credit Agreement, the Borrowers owe Lender at least $69,573,827.88 as of March 26, 2025; and

**WHEREAS**, the Borrowers have requested that the Lender provide them with postpetition loans and advances and other financial or credit accommodations, and the Lender has agreed—subject to the conditions set forth herein and in the DIP Order—to extend a senior secured, superpriority, multiple-draw, credit facility to the Borrowers comprised of a New Money DIP Loan in an aggregate principal amount *not to exceed* **$1,,000** and a Roll Up DIP Loan in the aggregate principal amount of **$1,125,000**, each of which will be available to be drawn or deemed drawn, as applicable, after entry of the Interim Order.

**WHEREAS**, the Lender is only willing to make the Loans provided for by this Agreement in reliance on the truth and accuracy of these recitals and the other representations and warranties made by the Borrowers in the DIP Loan Documents and on all of the terms and conditions and provisions set forth in the DIP Loan Documents, which terms, conditions, and provisions are acknowledged and agreed to by the Borrowers.

**NOW, THEREFORE**, in consideration of the representations and mutual covenants and agreements contained in the DIP Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and in consideration of the statements set forth in the Recitals, the truth and accuracy of which (and reliance thereon by the Lender) are acknowledged by the Borrowers and the Lender (collectively, the "**Parties**") hereby covenant and agree as follows:

# ARTICLE I
# DEFINITIONS AND OTHER TERMS

1.01 **Defined Terms**

As used herein and in the DIP Loan Documents, the following terms have the meanings set forth below:

"**Affiliate**" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with the specified Person. For the purposes of this Agreement, the Lender will not be considered an Affiliate of any Borrower.

"**Agreement**" means this *Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement.*

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets (other than in ordinary course sales or sales of *de minimis* assets), financing (debt or equity), plan proposal, or restructuring of the Borrowers, other than the Plan.

"**Anti-Corruption Laws**" means all Laws of any jurisdiction applicable to the Borrowers concerning or relating to bribery or corruption, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, *et seq.*

"**Anti-Money Laundering Laws**" means all Laws of any jurisdiction applicable to the Borrowers concerning or relating to money laundering, including the Patriot Act.

"**Anti-Terrorism Laws**" means all applicable Laws of any jurisdiction applicable to the Borrowers and concerning or relating to terrorism or money laundering, including Title III of the Patriot Act, the Trading with the Enemy Act, the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended), and any related enabling legislation or executive orders.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) in respect of any Synthetic Lease of any Person, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease.

"**Avoidance Action**" means an action or claim brought under the Bankruptcy Code or applicable state law to recover certain transfers of property or to avoid certain obligations incurred by a Debtor before the Petition Date. These actions include actions to avoid and recovery preferences, fraudulent transfers, and post-petition transfers as well as other avoidance actions as provided for under Bankruptcy Code sections 544, 545, 547, 548, 549, and 550 and applicable state laws.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Code**" means title 11 to the United States Code, 11 U.S.C. §§ 101–1532.

"**Board of Directors**" means, with respect to any Person, the board of directors of such Person, or any equivalent body performing similar functions, including boards of advisors, managers, or members. It also includes any committee of the board authorized to exercise the board's powers.

"**Borrowers**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Borrowing**" means a borrowing or deemed borrowing of a Loan on a given date.

"**Borrowing Request**" means an irrevocable written request for a Borrowing of Loans, substantially in the form of *Exhibit A* and that contains: (a) the requested date of the Borrowing (which must be a Business Day); (b) the principal amount of New Money DIP Loans to be borrowed; (c) the last four digits of the account(s) to which funds are to be disbursed; and (iv) a certification of compliance with the terms of the Budget and Milestones and the absence of any default under the Agreement.

"**Budget**" means the 13-week cash flow forecast attached to this Agreement as **Exhibit B**, approved by the Lender at its sole discretion and by the Bankruptcy Court pursuant to the DIP Order. This budget may be amended or modified in accordance with this Agreement and the DIP Order.

"**Business**" means, at any time, the collective operations by the Borrowers.

"**Business Day**" means any day other than a Saturday, Sunday, or a day when commercial banks in the State of New York are authorized or required to close.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure for the purchase or acquisition of fixed or capital assets classified as capital expenditures under GAAP, excluding normal replacements and maintenance properly charged to current operations.

"**Capital Lease**" means any lease of property by a Person that, in accordance with GAAP, must be accounted for as a capital lease on that Person's balance sheet.

"**Carve-Out**" means collectively:

(a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the UST pursuant to 28 U.S.C. §1930(a), plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice);

(b) reasonable fees and expenses incurred by a trustee and payable under Bankruptcy Code section 726(b), not exceeding $25,000 in aggregate (without regard to the Carve-Out Trigger Notice); and

(c) to the extent allowed at any time, all unpaid fees and expenses of professionals retained by the Borrowers and, subject to amounts expressly set forth in the Budget, any Committee appointed in the Chapter 11 Cases, that

(i) are incurred on or before the fifth Business Day after the delivery of the Carve-Out Trigger Notice; or

(ii) are incurred after the fifth Business Day following the delivery of a Carve-Out Trigger Notice, subject to an aggregate cap of $100,000 for the Debtors' professionals and a separate aggregate cap of $15,000 for the Committee professionals, if any.

"**Carve-Out Trigger Notice**" means a written notice delivered by the Lender to the Borrowers' counsel, the UST, and counsel to any Committee after an Event of Default under this Agreement has occurred and while it is continuing.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law; (b) any change in any Law or its administration, interpretation, or application by any Governmental Authority, central bank, or comparable agency; or (c) the issuance of any request, guideline, or directive (whether or not having the force of Law) by any Governmental Authority, central bank, or comparable agency.

"**Chapter 11 Cases**" means the cases commenced by the Borrowers under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on the Petition Date, Case Nos. [_____].

"**Committee**" means, collectively, any official committee of unsecured creditors or other committee formed, appointed, or approved by the UST or the Bankruptcy Court in any Chapter 11 Case.

"**Contractual Obligation**" means any provision of any security issued by a Person or any agreement, instrument, or undertaking to which the Person is a party or by which the Person or its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through voting power, contract, or otherwise. "Controlled" has a corresponding meaning. A Person is deemed to be Controlled by another if the latter possesses, directly or indirectly, the power to vote 10% or more of the securities with ordinary voting power for the election of directors, managing general partners, or equivalents. The Lender will not be deemed to Control the Borrowers.

"**Debt Issuance**" means the issuance by any Borrower of any Indebtedness.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other laws related to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions that affect the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that with notice or the passage of time would be an Event of Default.

"**Default Rate**" means an interest rate equal to the Interest Rate plus **4%** per annum, to the fullest extent permitted by applicable Laws.

"**DIP Collateral**" means all assets pledged, mortgaged, assigned, granted, or subjected to a Lien under this Agreement or the DIP Order.

"**DIP Loan Documents**" means this Agreement, the DIP Order, and each other agreement, instrument, or document executed or delivered in connection with this Agreement or the DIP Order. References to a Loan Document in this Agreement or any other Loan Document include all appendices, exhibits, and schedules thereto.

"**DIP Obligations**" means all advances, debts, principal, interest, premiums, fees, liabilities, obligations, covenants, and duties of the Borrowers arising under any DIP Loan Document or related to any Loan. This includes amounts payable in accordance with the DIP Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, and now existing or hereafter arising. It also includes interest, premiums, and fees that accrue after the commencement of any proceeding under any Debtor Relief Law against any Borrower regardless of whether such interest and fees are allowed claims in the proceeding.

"**DIP Order**" means the Interim Order or Final Order, as applicable.

"**Disclosure Statement**" means the document filed in the Chapter 11 Cases providing adequate information about the Borrowers' financial affairs, their proposed plan of reorganization or liquidation ("**Plan**"), and the means for its implementation and approved by the Bankruptcy Court.

"**Disposition**" or "**Dispose**" means any action by a Borrower to sell, transfer, license, lease, or otherwise part with any assets outside the ordinary course of business, including: (a) any Sale and Leaseback Transaction; or (b) any sale, assignment, or transfer of notes or accounts receivable, or the associated rights and claims, with or without recourse.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Effective Date**" means the date upon which a confirmed Plan in any Chapter 11 Cases becomes operative and binding.

"**Environment**" means ambient and indoor air, surface water, groundwater (including potable water, navigable water, and wetlands), land surface, subsurface strata, sediment, and natural resources such as flora and fauna.

"**Environmental Laws**" means any and all Laws relating to (a) the Environment, preservation, or reclamation of natural resources, or the generation, use, handling, transportation, storage, treatment, or Release of any Hazardous Material; or (b) human and employee health as affected by exposure to Hazardous Materials.

"**Environmental Liability**" means any liability, contingent or otherwise, of the Borrowers, including liability for personal injury, damages, costs of environmental investigation, feasibility

studies, remediation, fines, penalties, or indemnities, directly or indirectly resulting from or based upon: (a) violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment, or disposal of any Hazardous Materials; (c) exposure to any Hazardous Materials; (d) the Release of any Hazardous Materials; or (e) any contract, agreement, or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permits**" means any and all Permits required under any applicable Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the following: (a) shares of capital stock or other ownership or profit interests in such Person; (b) warrants, options, or other rights to purchase or acquire shares of capital stock or other ownership or profit interests in such Person; (c) securities convertible into or exchangeable for shares of capital stock or other ownership or profit interests in such Person, or warrants, rights, or options to purchase or acquire such shares or interests; and (d) any other ownership or profit interests in such Person, including partnership, member, or trust interests, whether voting or nonvoting, and whether or not such shares, warrants, options, rights, or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor thereto.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Borrowers within the meaning of Tax Code section 414(b) or (c) (and Tax Code sections 414(m) and (o) for purposes of provisions relating to Tax Code section 412 or ERISA section 4001(a)(14). However, neither the Lender nor any of its Affiliates will be considered an ERISA Affiliate for the purposes of this Agreement. Any former ERISA Affiliate of a Person will continue to be considered an ERISA Affiliate of such Person only for the period during which it was an ERISA Affiliate (and not thereafter) and for liabilities arising during that period for which such Person could be liable under the Tax Code or ERISA.

"**ERISA Event**" means any of the following:

(a) A reportable event;

(b) A withdrawal by the Borrowers or any of their ERISA Affiliates from a Pension Plan subject to ERISA section 4063 during a plan year in which such entity was a substantial employer (as defined in ERISA section 4001(a)(2)) or a cessation of operations treated as such a withdrawal under ERISA section 4062(e);

(c) A complete or partial withdrawal by the Borrowers or any of their ERISA Affiliates from a Multiemployer Plan, or notification that a Multiemployer Plan is in "critical," "endangered," or "critical and declining" status (as defined in Tax Code section 432 or ERISA section 305)

(d) A mass withdrawal from a Multiemployer Plan under ERISA section 4219(c)(1)(D);

(e) The withdrawal from a Multiemployer Plan by any employer required to be listed in Schedule R of the Multiemployer Plan's Form 5500;

(f) A Multiemployer Plan's adoption, amendment, or update of a rehabilitation plan under ERISA section 305(e);

(g) The adoption by a Multiemployer Plan of any plan rule creating employer liability in addition to collectively bargained contributions or withdrawal liability;

(h) The filing of a notice of intent to terminate, treatment of a Pension Plan amendment as a termination under ERISA sections 4041 or 4041A, or commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan;

(i) An event or condition constituting grounds under ERISA section 4042 for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan;

(j) Notice received by the Borrowers or any of their ERISA Affiliates from a Multiemployer Plan it is subject to ERISA section 4245;

(k) The failure of the Borrowers or any of their ERISA Affiliates to make a required installment under Tax Code section 430(j) with respect to any Pension Plan by its due date, or failure of any Pension Plan to satisfy the minimum funding standards (as defined in Tax Code section 412 or ERISA section 302), whether or not waived in accordance with Tax Code section 412(c) or ERISA section 302(c);

(l) A determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Tax Code section 430 or ERISA section 303);

(m) The filing of an application for a waiver of the minimum funding standard with respect to any Pension Plan pursuant to Tax Code section 412 or ERISA section 302;

(n) The failure by the Borrowers or any of their ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Tax Code section 431 or 432;

(o) The failure by the Borrowers or any of their ERISA Affiliates to pay any installment payment with respect to withdrawal liability under ERISA section 4201 when due (after expiration of any applicable grace period);

(p) The imposition of a Lien pursuant to Tax Code section 430(k) or ERISA section 303(k) or 4068 with respect to any Pension Plan;

(q) The assertion of a material claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or its assets or against the Borrowers or any of their ERISA Affiliates in connection with any ERISA Plan; or

(r) The imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under ERISA section 4007, upon the Borrowers or any of their ERISA Affiliates.

"**ERISA Plan**" means any "employee benefit plan" (as defined in ERISA section 3(3)) in respect of which the Borrowers or any of their ERISA Affiliates is, or under ERISA section

7

4062 or 4069 would be deemed to be if the plan were terminated, an "employer" as defined in ERISA section 3(5).

"**Event of Default**" has the meaning specified in Section 9.01.

"**Excluded Account**" means any account used exclusively for payroll, payroll taxes, or employee benefits and funded in the ordinary course of business.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender:

- Taxes imposed on or measured by net income (however denominated)
- Franchise Taxes, and
- Branch profits Taxes

in each case, imposed as a result of the Lender being organized under the laws of, or having its principal office or Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof).

"**Final Maturity Date**" means the earlier of (a) the date that is one Business Day after the Effective Date; or (b) the date that is 120 days following the Petition Date.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or other approved procedures and which: (a) is in form and substance satisfactory to the Lender at its sole and absolute discretion; (b) is in effect and not stayed; (c) authorizes the Borrowers to obtain credit, incur (or guaranty) the Indebtedness, and grant Liens under the DIP Loan Documents; (d) granting the Lender's Superpriority Claims and authorizes the use of cash collateral on the terms and conditions set forth in this Agreement; (e) approving the Borrowers' stipulations with respect to the validity, priority, and amount of the Prepetition Indebtedness; (f) grants the Lender the right to credit bid all Claims under the DIP Loan Documents and the Prepetition Loan Documents; (f) authorizes and directs payment of all Lender's Expenses; and (g) grants relief from the automatic stay  imposed pursuant to 11 U.S.C. § 362 ("**Automatic Stay**") to permit the Lender to exercise all rights and remedies available to it under the Prepetition Loan Documents and applicable Law. For clarity, all extensions, modifications, and amendments to the Final Order must also be in form and substance satisfactory to the Lender at its sole discretion.

"**Fiscal Year**" means each 12-month period ending on December 31.

"**GAAP**" means generally accepted accounting principles in the United States, as set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants, and the Financial Accounting Standards Board, consistently applied and in effect from time to time.

"**Governmental Authority**" means any entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government, including: (a) the government of the United States or any other nation; (b) any political subdivision thereof, whether state or local; (c) any tribal, aboriginal, or native government or corporation; (d) any

agency, authority, instrumentality, regulatory body, court, central bank, or other entity; or € any supra-national bodies, such as the European Union or the European Central Bank.

"**Guarantee**" means, with respect to any Person: (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person, whether directly or indirectly; (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of another Person, whether or not such Indebtedness or other obligation is assumed by such Person, or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien. The amount of any Guarantee is deemed to be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made, or if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Hazardous Materials**" means: (a) any substance, material, or waste designated or defined as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "pollutant or contaminant," "toxic waste," or "toxic substance" under any provision of Environmental Law; and (b) any petroleum, petroleum distillates, petroleum products, asbestos or asbestos-containing materials, urea-formaldehyde insulation, explosive or radioactive materials, and polychlorinated biphenyls

"**Indebtedness**" means, with respect to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) obligations for borrowed money including those evidenced by bonds, debentures, notes, loan agreements, or other similar instruments; (b) direct or contingent obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guarantees, surety bonds, or similar instruments; (c) net obligations under any swap agreement; (d) obligations to pay the deferred purchase price of assets or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days); (e) Capital Lease and Synthetic Lease obligations (the amount of which will be deemed to equal the Attributable Indebtedness in respect thereof as of the relevant date); (f) obligations prior to the Maturity Date to purchase, redeem, retire, defease, or otherwise make any payment in cash or cash equivalents in respect of any Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (g) Guarantees in respect of any of the foregoing; and (h) indebtedness (excluding prepaid interest) secured by a Lien on assets owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness has been assumed or is limited in recourse, *provided that* if recourse is limited solely to property of such Person, the amount of such Indebtedness will be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the net book value of such property encumbered thereby.

Notwithstanding the foregoing, Indebtedness does not include Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which a Person is a general partner or a joint venturer and that is expressly made non-recourse to such Person. Indebtedness also excludes, to the extent consistent with the Borrowers' past practices: (a) purchase price holdbacks arising in the ordinary course of business to satisfy warranties

or other unperformed obligations of the seller of such asset; (b) trade accounts payable, deferred revenues, liabilities associated with customer prepayments and deposits, and other accrued obligations (including transfer pricing and accruals for payroll and other operating expenses) incurred in the ordinary course of business; (c) operating leases; (d) customary obligations under employment agreements and deferred employee compensation; or (e) prepaid or deferred revenue and deferred tax liabilities.

"**Interest Payment Date**" means the Maturity Date.

"**Interest Rate**" has the meaning set forth in Section 1.01(a).

"**Interim Order**" means the order of the Bankruptcy Court entered in these Chapter 11 Cases after an interim hearing and which: (a) is in form and substance satisfactory to the Lender at its sole and absolute discretion; (b) authorizes the Borrowers to obtain credit, incur (or guaranty) the Indebtedness, and grant Liens under the DIP Loan Documents; (c) granting the Lender's Superpriority Claims and authorizing the use of cash collateral on the terms and conditions set forth in this Agreement; (d) approving the Borrowers' stipulations with respect to the validity, priority, and amount of the Prepetition Indebtedness; (e) grants the Lender the right to credit bid all Claims under the DIP Loan Documents and the Prepetition Loan Documents; (f) authorizes and directs payment of all Lender's Expenses; and (g) grants relief from the Automatic Stay to permit the Lender to exercise all rights and remedies available to it under the Prepetition Loan Documents and applicable Law.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the acquisition, in a single transaction or in a series of related transactions, of all or substantially all of the assets of another Person or more than a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, assets, services, assumption of Indebtedness, securities or otherwise. For purposes of covenant compliance, the amount of any Investment will be the amount actually invested, without adjustment for subsequent increases or decreases in value, or the write-ups, write-downs or write-offs with respect thereto, of such Investment net of any return representing a return of capital or repayment of principal or payment of interest, if applicable, with respect to such Investment.

"**Investment Property**" means any security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account.

"**Involuntary Disposition**" means any loss of, damage to, or destruction of, or any condemnation or other taking for public use of, any asset of any Borrower.

"**Laws**" mean all statutes, treaties, rules, guidelines, regulations, ordinances, codes, and administrative or judicial precedents or authorities, whether international, foreign, federal, state, local, tribal, or Aboriginal. This includes interpretations by any Governmental Authority responsible for enforcement, interpretation, or administration thereof as well as all applicable administrative orders,

directives, duties, requests, licenses, authorizations, permits, and agreements with any Governmental Authority, regardless of whether they have the force of law.

"**Lender's Expenses**" means all reasonable and documented fees, expenses, and costs incurred by the Lender, including with respect to third-party consultants, financial and accounting advisors, auditors, or legal counsel (such as Pierson Ferdinand LLP), appraisal fees, Lien search fees, inspection fees, filing fees, and other out-of-pocket expenses in connection with the Chapter 11 Cases or related appeals or insolvency proceedings as well as the preparation, negotiation, documentation, administration, defense, enforcement, amendment, or modification of the DIP Loan Documents.

"**Lender Professionals**" has the meaning specified in Section 10.04(a).

"**Lien**" means: (a) any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever. This includes any conditional sale or other title retention agreement, any easement, right of way, or other encumbrance on title, and any financing lease having substantially the same economic effect as any of the foregoing; and (b) in the case of securities or Equity Interests, any purchase option, call, or similar right of a third party with respect to such securities or Equity Interests; *provided, however*, that in no event will any operating lease in and of itself be deemed to constitute a Lien.

"**Loans**" means the New Money DIP Loans and the Roll Up DIP Loans.

"**Material Adverse Event**" means: (a) a material adverse change in or upon the Business, assets, liabilities (whether actual or contingent), or financial condition of the Borrowers as a whole; (b) a material impairment of the ability of the Borrowers as a whole to pay the DIP Obligations or to perform their other material obligations under the DIP Loan Documents; or (c) a material adverse change in the legality, validity, binding effect, or enforceability of any DIP Loan Document against any Borrower. For clarity, the filing, commencement, and continuation of the Chapter 11 Cases, as well as the events that typically result from these actions, do not constitute a Material Adverse Event.

"**Material Contract or Lease**" means, with respect to each Borrower: (a) all real property leases; (b) all franchise agreements; (c) all area development agreements; (d) all contracts with food, beverage, and alcohol suppliers, including any nationally or regionally-known suppliers participating in a preferred vendor program with the Borrowers; (e) all suppliers approved to source equipment, fixtures, and furnishings to the Borrowers' franchisees; (f) all contracts required to maintain the Borrowers' data management platform; and (g) all other leases, contracts, agreements, instruments, and binding commitments or undertakings of any Borrower, the performance or breach of which could reasonably be expected to result in a Material Adverse Event.

"**Material ERISA Event**" means the incurrence of liabilities by any Borrower or its ERISA Affiliates that exceeds $50,000 in aggregate.

"**Maturity Date**" means the earliest of: (a) the Final Maturity Date; (b) the date upon which the Interim Order expires if the Final Order has not been entered no later than 35 days after the

Petition Date; (c) the date of conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code; (d) the date of consummation of the sale of all or substantially all of the assets of the Borrowers, taken as a whole, pursuant to section 363 of the Bankruptcy Code; and (e) the date of the acceleration of the Loans and termination of the New Money DIP Commitments hereunder (the "**DIP Termination Date**").

"**Milestones**" has the meaning set forth in Section 27.01.

"**Multiemployer Plan**" means any employee benefit plan of the type described in ERISA section 3(37) or 4001(a)(3) that is subject to ERISA and to which the Borrowers or any of their ERISA Affiliates makes or are obligated to make contributions or, during the preceding five plan years, have made or been obligated to make contributions.

"**Net Cash Proceeds**" means the aggregate cash or cash equivalents proceeds received by the Borrowers in respect of any Disposition, Debt Issuance, or Involuntary Disposition, including by way of insurance proceeds or condemnation awards or sale or issuance of Equity Interests, net of: (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, costs, expenses and sales commissions); (b) Taxes paid as a result thereof or reasonably estimated to be actually payable within two years of the date of the relevant Disposition, Debt Issuance, or Involuntary Disposition as a result thereof; (c) payment of ordinary course expenses set forth in the Budget; and (d) in the case of any Disposition, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Lender) on the related property; it being understood that "Net Cash Proceeds" will include any cash or cash equivalents received upon the sale or other Disposition of any non-cash consideration received by the Borrowers in any Disposition, Debt Issuance, Involuntary Disposition or sale or issuance of Equity Interests.

"**New Money DIP Commitment**" has the meaning specified in Section 22.01(a)(i).

"**New Money DIP Loan**" means the loan to the Borrower by the Lender as set forth in Section 22.01(a)(i).

"**Note**" has the meaning specified in Section 22.06.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any foreign jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received, or perfected a security interest under,

engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court, documentary, intangible, recording, filing, or similar Taxes arising from: (a) any payment made under any Loan Document; (b) the execution, delivery, performance, enforcement, or registration of any Loan Document; (c) the receipt or perfection of a security interest under any Loan Document; or (d) any other aspect related to any Loan Document, excluding Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Patriot Act**" means the USA Patriot Act (Title III of Pub. L. 107-56, which was signed into law October 26, 2001.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in ERISA section 3(2)), other than a Multiemployer Plan, that (i) is subject to Title IV of ERISA or the minimum funding standards under Tax Code section 412 and (ii) is sponsored or maintained by the Borrowers or their ERISA Affiliates or to which the Borrowers or their ERISA Affiliates contribute or have an obligation to contribute, or in the case of a multiple employer or other plan described in ERISA section 4064(a), has made contributions at any time during the immediately preceding five plan years.

"**Permit**" means any permit, license, certificate, approval, consent, clearance, notification, waiver certification, registration, franchises, accreditations, qualification, or authorization issued or granted by any Governmental Authority or pursuant to any applicable Law.

"**Permitted Dispositions**" means (so long as no Default exists or would result therefrom) the following:

      (a)      the granting of Permitted Liens;

      (b)      (i) any involuntary loss, damage, or destruction of assets by casualty and (ii) to the extent such asset is equipment, the Disposition of the assets so damaged or destroyed for fair market value (if any);

      (c)      the leasing of equipment by any Borrower in the ordinary course of business or as otherwise consented to in writing by the Lender;

      (d)      the making of a distribution or dividend that is permitted to be made by the Lender;

      (e)      the making of a Permitted Investment;

      (f)      sales or other Dispositions of assets from one Borrower to another Borrower;

      (g)      sales of inventory in the ordinary course of business;

(h)    rejection of leases, closure of locations, and/or sale, liquidation or otherwise disposal of obsolete, surplus, or worn-out property as permitted by order of the Bankruptcy Court; and

(i)    sale of substantially all of the assets of one or more Borrowers pursuant to a final, non-appealable order entered by the Bankruptcy Court in a form acceptable to Lender in its sole and absolute discretion.

"**Permitted Liens**" means, at any time, Liens in respect of assets the Borrowers permitted to exist at such time pursuant to the terms of Section 8.02.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority, or other entity.

"**Petition Date**" means March 26, 2025.

"**Plan**" means a plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code that includes (among other items) customary discharge, injunction, exculpation, and release provisions, including a debtor release of estate claims and causes of action and consensual third- party releases with respect to the Lender and either (a) provides for payment in full of all Prepetition Obligations and Loans on the Effective Date; or (b) is acceptable to the Lender at its sole and absolute discretion, is structured in a tax efficient manner, and provides that (i) the Lender will receive 100% of the equity interests in the reorganized Debtors in exchange for cancellation of a portion of the Prepetition Obligations and (ii) the Loans will either be paid in full on the Effective Date or converted into loans under an exit facility on terms acceptable to Borrowers and the Lender.

"**Prepetition Credit Agreement**" means that certain *Credit Agreement* dated May 27, 2020, among the Prepetition Credit Parties, as borrowers and guarantors, and Bar Louie LLC, as lender (as the assignee of Antares Holdings LP, MidCap Financial Trust, Midcap Funding XLIX Trust (as assignee of Woodmont 2017-3 LP), and Parthenon Loan Funding) and administrative agent (as the successor to Antares Capital LP), as amended, restated, supplemented, renewed, or otherwise modified through the Petition Date.

"**Prepetition Credit Parties**" means BLH Acquisition Co., LLC, as borrower, and BLH HoldCo LLC and BLH Restaurant Franchisees LLC, as guarantors, with respect to the Prepetition Credit Agreement.

"**Prepetition Loan Documents**" means the Prepetition Credit Agreement and other agreements, documents, and instruments executed or delivered in connection therewith.

"**Prepetition Obligations**" means the "Obligations" to the Lender under, and as defined in, the Prepetition Credit Agreement and other Prepetition Loan Documents.

"**Related Parties**" means, with respect to any Person, such Person's directors, officers, employees, agents, advisors and sub-advisors of such Person; *provided* that for purposes of this Agreement, the Lender may not be a Related Party of any Borrower, or its Affiliates, partners, directors, officers, employees, agents, advisors, or sub-advisors.

"**Release**" means any depositing, spilling, leaking, seeping, pumping, pouring, emitting, emanating, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing in, into or through the Environment.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived pursuant to DOL Reg. Section 4043."

"**Responsible Officer**" means (a) with respect to the Borrowers, the chief restructuring officer, president, chief financial officer, treasurer or assistant treasurer of such Borrower or any other officer of a Borrower designated as a "Responsible Officer" for purposes of the DIP Loan Documents by a Borrower in writing to the Lender and reasonably acceptable to the Lender, and (b) with respect to the Lender, any partner, managing director, principal, vice president, assistant vice president, assistant treasurer, assistant secretary, or any other officer of the Lender customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Agreement. Any document delivered hereunder that is signed by a Responsible Officer of a Borrower will be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such Responsible Officer will be conclusively presumed to have acted on behalf of such Borrower.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other assets) with respect to any Equity Interests of any Borrower, or any payment (whether in cash, securities or other assets), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to any Borrower's stockholders, partners or members (or the equivalent Person thereof), any payment of management fees (or other fee of a similar nature) or out-of-pocket expenses to the holders of such Equity Interests or any setting apart of funds or assets for any of the foregoing.

"**Roll Up DIP Loan**" has the meaning specified in Section 2.01(a)(ii).

"**Sale and Leaseback Transaction**" means, with respect to any Borrower, any arrangement, directly or indirectly, with any Person whereby the Borrower sells or transfers any assets used or useful in its Business, whether currently owned or hereafter acquired, and subsequently rents or leases those same assets or other assets intended for substantially the same purpose as the asset sold or transferred.

"**Sanctioned Country**" means any country, region or territory to the extent that such country or territory itself is the subject of comprehensive Sanctions (as of the date of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, (a) any Person who is the subject of any Sanctions, including any Person listed or designated as being the target of any Sanctions (whether by name or by reason of being included in a class of Persons), (b) any Person operating, having a place of business, organized, located or resident in a Sanctioned Country, (c) any agency of the

government of or an organization controlled by a Sanctioned Country, or (d) any Person that is 50% or more, individually or in the aggregate, directly or indirectly, owned, or that is Controlled by, one or more of the Persons indicated in clauses (a), (b) and/or (c), or acting directly or indirectly on behalf of any such Person.

"**Sanctions**" means any economic, financial or trade sanctions, laws, regulations or restrictive measures, or trade embargoes, imposed, administered or enforced from time to time by (a) the federal government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) the United Nations or its Security Council, (c) the European Union, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other relevant sanctions authority, including any other governmental or regulatory authority, institution or agency which administers economic, financial or trade sanctions laws, regulations, trade embargoes or restrictive measures applicable to the Borrowers or the Lender.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which at least a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"**Superpriority Claim**" means a claim against any Borrower in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, subject to the Carve-Out in all respects.

"**Synthetic Lease**" means any synthetic lease, tax retention operating lease, off- balance sheet loan or similar off-balance sheet financing arrangement whereby the arrangement is considered borrowed money Indebtedness for tax purposes but is classified as an operating lease or does not otherwise appear on a balance sheet under GAAP.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"**United States**" means the United States of America.

"**UST**" means the Office of the United States Trustee for Region 3.

"**Variance Report**" means a weekly report to be provided by Borrowers to the Lender: (a) showing for the immediately preceding week the amount of variance and percentage variance of

actual disbursements of the type of each line item set forth in the Budget (on a line item basis) from those disbursements and other amounts reflected in the Budget for the corresponding periods; (b) explaining the reason for any such variance; and (c) disclosing any material change in accounting policies or financial reporting practices.

"**Voting Stock**" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

1.02    **Other Interpretive Provisions**

With reference to the DIP Loan Documents, unless otherwise specified therein:

(a)    The same definitions of terms apply whether they are singular or plural.

(b)    Any pronoun can mean he, she, or it, depending on the context.

(c)    The phrase "without limitation" automatically follows the words "include," "includes," and "including."

(d)    Unless the context requires otherwise: (i) any agreement, instrument, or other document (including any Organization Document) means the current version of that document as well as any amendments, supplements, changes, additions, restatements, or modifications that may be made from time to time thereafter; (ii) any Person also means that Person's successors and assigns; (iii) the words "herein," "hereof," "hereunder," and similar words refer to the entire DIP Loan Document where they appear, not just a part of it; (iv) all references to Articles, Sections, Exhibits, and Schedules are to the ones in the DIP Loan Document where the reference appears; (v) any Law includes all the related rules and regulations that consolidate, amend, replace, or explain that Law, and any Law means the current version of that Law, with any changes, modifications, or supplements; and (vi) the words "asset" and "property" mean the same thing and refer to any kind of real or personal property or asset, tangible or intangible, such as cash, securities, accounts, and contract rights.

(e)    Terms used herein (including "Accounts," "Chattel Paper," "Documents," "General Intangibles," "Instruments," "Inventory," and "Proceeds") that are defined in the UCC, unless otherwise defined herein, have the meanings specified in the UCC.

(f)    When calculating time periods between two specified dates, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(g)    Section headings in the DIP Loan Documents are included for convenience only and do not affect the interpretation of any DIP Loan Document.

1.03    **Accounting Terms**

Unless otherwise specifically stated in this document, all accounting terms not fully defined

herein are to be interpreted in accordance with GAAP, applied consistently over time and in a manner consistent with that used in preparing the Borrowers' financial statements. All financial data, including financial ratios and other financial calculations required by this Agreement, must also be prepared in accordance with GAAP using the same methods as used in preparing the Borrowers' financial statements. However, calculations of Attributable Indebtedness under any Synthetic Lease, or the implied interest component of any Synthetic Lease, are to be made by the Borrowers following accepted financial practices and in line with the terms of the respective Synthetic Lease.

1.04   **Times of Day**

Unless otherwise specified, all references in the DIP Loan Documents to times of day are references to Eastern time (Eastern daylight or standard, as applicable).

## ARTICLE II
## THE LOANS

2.01   **The Loans**

(a)   **DIP Loans**. Subject to the terms and conditions set forth herein and in the DIP Order, following entry of the Interim Order:

(i)   The Lender will make a loan to the Borrowers—upon Borrowers' written request in accordance with Section 22.02 and subject to Article IV of this Agreement—in an aggregate amount *not to exceed* **$1,350,000** (the "**New Money DIP Commitment**"), which loan commitment will expire once fully funded.

(ii)   **$1,125,000** of the Prepetition Obligations will be deemed to be a term loan made by the Lender and borrowed by the Borrowers under this Agreement (the "**Roll Up DIP Loan**"). This deemed Borrowing will entitle the Borrowers to receive an equivalent principal amount of Prepetition Obligations for cancellation, without receiving cash or other consideration from the Lender, and consequently, the Borrowers will owe the aggregate principal amount of the Initial Roll Up DIP Loan to the Lender under this Agreement, and any such amounts will no longer be outstanding under the Prepetition Loan Documents.

(b)   Once repaid, whether the repayment is voluntary or required, any amounts borrowed (or deemed borrowed) under this Section 2.01 cannot be reborrowed.

2.02   **Loan Borrowing**

The Borrowers may make a Borrowing request after entry of the Interim Order. To do so, the Borrowers must deliver the Borrowing Request to the Lender no later than 12:00 p.m. on the Business Day before the requested Borrowing date (or a later time agreed to by the Lender at its sole discretion). However, the Lender's obligation to advance any requested amounts is subject to the conditions precedent outlined in Article V below.

2.03   **Prepayments**

(a)      **Voluntary Prepayments**. The Borrowers may voluntarily prepay the Loans, in whole or in part, at any time without premium or penalty, by providing notice to the Lender. The Lender must receive this notice no later than 2:00 p.m., three Business Days before the intended prepayment date. Each notice must specify the date and amount of the prepayment. Any prepayment of a Loan must include all accrued interest on the Loan.

(b)      **Mandatory Prepayments.**

(i)      **Dispositions and Involuntary Dispositions**. Upon receiving the Net Cash Proceeds from a Disposition of less than all or substantially all of its assets or an Involuntary Disposition consummated on or after the Petition Date, the Borrowers must prepay the Loans within three Business Days after realizing or receiving such Net Cash Proceeds. The prepayment amount must equal 100% of the Net Cash Proceeds from the Disposition or Involuntary Disposition and must include all interest on the prepaid principal amount through the prepayment date. No later than three Business Days following a Disposition of all or substantially all of its assets, the Borrowers must apply the Net Cash Proceeds from such Disposition and any Cash in excess of the Cash reserves required to pay outstanding and projected ordinary course expenses pursuant to the Budget first to the outstanding balance of the Loans and then to the Prepetition Obligations. The payment amount must include 100% of the Net Cash Proceeds from the Disposition and all interest on the prepaid principal amount of the Loans through the payment date.

(ii)      **Debt and Equity Issuances**. Upon receiving the Net Cash Proceeds from either any Debt Issuance not permitted under Section 8.03 or the sale or issuance of any of the Borrowers' Equity Interests (excluding sales or issuances to another Borrower), the Borrowers must prepay the Loans within three Business Days after realizing or receiving such Net Cash Proceeds. The prepayment amount must be equal to 100% of the Net Cash Proceeds from the Debt Issuance or Equity Interests sale or issuance and must include all interest on the prepaid principal amount through the prepayment date.

(iii)      **Notice and Timing of Mandatory Prepayments.** Any prepayment under clauses (i) or (ii) of Sections 22.01(b) must occur on or before the third Business Day following the realization or receipt of the Net Cash Proceeds by the Borrowers. The Borrowers must notify the Lender in writing of any mandatory prepayment of Loans required under clauses (i) and (ii) of Section 22.01(b). The Lender must receive this notification no later than 12:00 p.m. on the Business Day before the prepayment date. Each notice must specify the prepayment date and include a reasonably detailed calculation of the total prepayment amount.

(c)      **Application of Prepayments.** All amounts to be paid pursuant to Section 22.01(a) or (b) will be applied in the following order:

(i)      **First:** To the payment of fees, indemnities, expenses, and other amounts (including the fees and expenses Lender's counsel and amounts payable under ARTICLE III) as specified in the DIP Loan Documents.

(ii)      **Second**: To the payment of accrued and unpaid interest on the Loans.

(iii)     **Third:** To the payment of unpaid principal amounts of the DIP Obligations.

2.04    **Repayment of Loans**

On the Maturity Date, the Borrowers must repay the Lender the total principal amount of all outstanding Loans. This repayment must include all accrued and unpaid interest thereon, as well as any outstanding fees, payable in accordance with the DIP Loan Documents.

2.05    **Interest**

(a)     **Loans**. Subject to the provisions of Section 2.05(b), the Loans will bear interest on the outstanding principal amount from the date they are borrowed until they are repaid. Interest will accrue on a simple basis at an annual rate of 12.5% (the "Interest Rate").

(b)     **Default Interest**.

(i)     Upon the occurrence and during the continuance of an Event of Default, the Borrowers will pay interest on the outstanding DIP Obligations at an annual interest rate equal to the Default Rate, to the fullest extent permitted by applicable Laws.

(ii)     After the Maturity Date, accrued and unpaid interest on past due amounts (including interest on past due interest) will be due and payable upon demand.

(c)     **Interest Payment**. Interest will accrue and be paid to the Lender on the Interest Payment Date. It will be due and payable in accordance with the terms of this Agreement from and after the Petition date, both before and after judgment. Interest at the Default Rate will be payable on demand.

(d)     **Computation of Interest and Fees**.  All computations of interest for the Loans will be made on the basis of a 360-day year and actual days elapsed. Interest will accrue on each Loan from the day it is made and will not accrue on the day the Loan, or any portion of it, is repaid. However, if a Loan is repaid on the same day it is made, it will bear interest for one day. Each determination by the Lender of an interest rate or fee under this Agreement is conclusive and binding for all purposes, absent manifest error.

2.06    **Evidence of Debt**

The Lender may document the Loans by one or more accounts or records maintained by the Lender in the ordinary course of business. These accounts or records will be conclusive as to the amount of the Loans made by the Lender to the Borrowers and the interest and payments thereon, absent manifest error. However, any failure to record or any error in the accounts or records will not limit or otherwise affect the Borrowers' obligation to pay any amount actually owing with respect to the DIP Obligations. For clarity, this Agreement is executed as a "noteless" credit agreement. However, at the Lender's request at any time, the Borrowers agree to prepare, execute, and deliver to the Lender a promissory note, in form and substance satisfactory to the Lender and consistent with the terms of this Agreement, payable to the order of the Lender and its assigns (a "**Note**"). Thereafter, the Loans evidenced by such Note and the interest thereon will at all times be represented by one or more Notes in such form, payable to the order of the named

payee and its assigns.

2.07   **Lender Expenses**

The Borrowers must pay all of Lender's Expenses within five Business Days after the Lender's presentation of a payment request.

2.08   **Payments Generally**

The Borrowers must make all payments without condition or deduction for any counterclaim, defense, recoupment, or setoff. Except as otherwise expressly provided herein, the Borrowers must make all payments to the Lender in Dollars and in immediately available funds no later than 2:00 p.m. on the specified date. If the Lender receives payments after 2:00 p.m., the payments will be deemed received on the next Business Day, and any applicable interest or fee will continue to accrue. If any payment due by the Borrowers falls on a non-Business Day, the Borrowers may make the payment on the next Business Day, and this extension of time will be reflected in the computation of interest or fees, as applicable.

# ARTICLE III
# COLLATERAL

3.01   **Grant of Security Interests**

As security for all DIP Obligations, each Borrower hereby collaterally assigns and grants to the Lender a continuing first priority (subject to the Carve-Out) security interest in all assets of such Borrower, including but not limited to, the Proceeds thereof, whether now owned or existing or hereafter acquired or arising, regardless of where located, whether now owned or hereafter acquired or arising, regardless of where located, and all proceeds and products and supporting obligations (as defined in the Bankruptcy Code) in respect thereof, including the following:

(a)     All of the Borrowers' interests in deposit accounts, money, cash, cash equivalents, securities, or other property interests serving as collateral or funding sources for any other obligation;

(b)     all Investment Property, financial assets, and securities accounts;

(c)     All Accounts;

(d)     All contract rights;

(e)     All chattel paper;

(f)     All instruments;

(g)     All supporting obligations and letter-of-credit rights;

(h)     All General Intangibles, including payment intangibles, intercompany accounts, intellectual property, and software;

(i)     All deposit accounts, bank deposits, prepayments (including prepayments made to third-party vendors), deferred assets, refunds, credits, overpayments, and similar cash items; and

(j)     All tax credits and rights arising from any refunds due from federal, state, or local Governmental Authorities with respect to taxes paid by the Borrowers for periods ending on or before the Petition Date, including any Employee Retention Tax Credits to which the Borrowers may be entitled;

(k)     All inventory and other goods;

(l)     All motor vehicles, equipment, and fixtures;

(m)     All notes and documents of title;

(n)     All books, records, documents, and related assets including account ledgers, data processing records, computer software, and General Intangibles that evidence or relate to any of the foregoing;

(o)     All commercial tort claims, including any claims or rights to payments with respect to the Visa/Mastercard class action settlements, including those in connection *Mackmin v. Visa Inc*., D.D.C., No. 1:11-cv-01831, 5/29/24 and *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, E.D.N.Y., MDL 1720 (MKB) (JO);

(p)     all real property and rights therein;

(q)     all other personal property of the Borrowers, including proceeds from any Avoidance Actions and recoveries therefrom (but not the actions themselves); and

(r)     all accessions to, substitutions for, and replacements, products, and proceeds of any of the foregoing, including dividends or distributions on Investment Property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

(s)     All liquor licenses, permits, and approvals issued by any Governmental Authority, including any rights to renew or transfer such licenses;

(t)     All rights and interests under franchise agreements, including franchise fees, royalties, and any other payments due under such agreements;

(u)     All leasehold interests in real property used in the operation of the restaurant and franchise business, including any rights to renew or extend such leases;

(v)     All trademarks, trade names, service marks, logos, and other intellectual property specific to the restaurant and franchise business;

(w)     All customer lists, databases, and other customer-related information;

(x)     All rights and interests under contracts with suppliers, including any rights to

receive goods or services;

(y)    All point-of-sale systems, including hardware, software, and related data;

(z)    All menus, recipes, and other proprietary information related to the preparation and sale of food and beverages;

(aa)    All marketing and promotional materials, including digital and print media.

## 3.02    **Perfection of Security Interests and Liens**

(a)    Notwithstanding the perfection of any security interest granted under the DIP Order, the Lender retains the right, to the fullest extent permitted by applicable Law, to file or authorize the filing of one or more financing statements or any other documents deemed necessary by the Lender to disclose the Security Interests and/or Liens on the DIP Collateral established by this Agreement.

(b)    At the Lender's discretion, a certified copy of the DIP Order may be filed or recorded in filing or recording offices. This may be done in addition to, or instead of, filing financing statements, mortgages, notices of Lien, or similar instruments. All filing offices are authorized to accept a certified copy of the DIP Order for filing and recording. Regardless of the filing date, the perfection date will be the date of entry of the DIP Order.

(c)    Nothing in this Agreement imposes any responsibility or duty on the Lender regarding the validity, perfection, priority, or enforceability of the Liens granted hereunder. The Lender is not required to take any action to procure or maintain such validity, perfection, priority, or enforceability, including filing any financing statements, amendments, continuation statements, or other documents to perfect or maintain the security interest granted hereunder.

(d)    The Borrowers assume all responsibility and liability arising from or relating to the use, sale, or other Disposition of the DIP Collateral. The DIP Obligations will remain unaffected by any failure of the Lender to take steps to perfect the Liens or to collect or realize upon the DIP Collateral. Additionally, loss or damage to the DIP Collateral will not release any Borrower from any of the DIP Obligations.

## 3.03    **Concerning the DIP Collateral**

(a)    **Lender's Duties and Liabilities.**

(i)    The Lender's duties regarding the DIP Collateral are limited to its custody and accounting for monies actually received.

(ii)    The Lender has no obligation to take steps to preserve rights against any Person or any other rights related to the DIP Collateral, regardless of its knowledge of any matters.

(iii)    The Lender will not be liable for any interest on money received by it.

(iv)    The Lender will be deemed to have exercised reasonable care in the custody

and preservation of any DIP Collateral in its possession if it treats the DIP Collateral substantially similarly to its treatment of similar assets held for the benefit of third parties.

(b)    **Release or Re-conveyance of DIP Collateral.** The Lender is not required to execute or deliver any document evidencing the release or re-conveyance of DIP Collateral without receiving a certificate from a duly authorized officer of the Borrowers. This certificate must certify that the release is permitted by the DIP Loan Documents and that all conditions precedent to such release or re-conveyance have been met.

(c)    **Insurance, Taxes, and Maintenance.**

(i)    The Lender is not responsible for insuring the DIP Collateral, paying any taxes, charges, assessments, or liens on the DIP Collateral, or any tax reporting in connection with this Agreement.

(ii)    The Lender is not required to request or examine insurance coverage for the DIP Collateral.

(iii)    The Lender is not responsible for maintaining the DIP Collateral, except as expressly provided in this Agreement.

(d)    **Liability for Third Parties.**

(i)    The Lender is not liable for the acts or omissions of (x) any bank, depositary institution, custodian, or independent counsel of the Lender or the Borrowers; or (y) any other Person that may hold or possess the DIP Collateral and that was selected by the Lender with reasonable care.

(ii)    The Lender is not required to monitor the performance of any Persons holding the DIP Collateral as contemplated in Paragraph 3.03(d)(i).

## ARTICLE IV
## TAXES, YIELD PROTECTION, AND ILLEGALITY

4.01    **Taxes**

(a)    **General**. The Borrowers must make any and all payments in full, free and clear of, and without deduction or withholding for, any and all present or future Taxes. If the Borrowers are required by Law to deduct or withhold any Taxes from or in respect of any such payment to the Lender:

(i)    **Increase in Sum Payable.** The sum payable will, subject to applicable Law, be increased as necessary so that after making all required deductions and withholdings (including those applicable to additional sums payable under this Section 3.01), the Lender receives an amount equal to the amount it would have received had no such deductions or withholdings been made.

(ii)    **Making Deductions or Withholdings.** The Borrowers will make such

deductions or withholdings.

       (iii)    **Payment to Authorities.** The Borrowers will pay the full amount required to be deducted or withheld to the relevant taxation authority or other authority in accordance with applicable Law and within the time for payment prescribed by applicable Law.

       (b)    **Other Taxes**. The Borrowers must pay any present or future Other Taxes, excluding Excluded Taxes.

       (c)    **Tax Indemnity**. The Borrowers hereby indemnify the Lender for, and agree to hold the Lender harmless from, the full amount of all Taxes and Other Taxes payable by the Lender (excluding Excluded Taxes), as well as any related liability, cost, or amount, including penalties, interest, and expenses.

       (d)    **Payment of Taxes**. Within 30 days after required payment date of any Taxes or Other Taxes that the Borrowers must deduct or withhold in respect of any payment or delivery to the Lender, such Borrower must provide the Lender with evidence of payment acceptable to the Lender.

4.02    **Increased Costs**

       (a)    **Increased Costs Generally**. If any Change in Law (i) imposes, modifies, or deems applicable any reserve, special deposit, compulsory loan, insurance charge, or similar requirement against assets of, deposits with, or for the account of, or credit extended or participated in by, the Lender; (ii) subjects the Lender to any Taxes or Other Taxes payable by the Lender (excluding Excluded Taxes) with respect to this Agreement or any Loan made by it, or changes the basis of taxation of payments to the Lender in respect thereof; or (iii) imposes on the Lender any other condition, cost, or expense affecting this Agreement or the Loans, and if the result of any of the foregoing would be to increase the cost to the Lender of making or maintaining the Loan, or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest, or any other amount) then, upon the Lender's request, the Borrowers must pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

       (b)    **Certificates for Reimbursement**. A certificate from a Responsible Officer of the Lender, detailing the amount or amounts necessary to compensate the Lender as specified in paragraph (a) of this Section 4.02, and delivered to the Borrower, will be conclusive absent manifest error. The Borrowers must pay the Lender the amount shown as due on the certificate within five Business Days after receiving it.

       (c)    **Delay in Requests**. The Lender's failure or delay in demanding compensation pursuant to this Section 4.02 will not constitute a waiver of the Lender's right to demand such compensation.

4.03    **Survival**

All of the Borrower's obligations under this Article IV will survive repayment of all other

DIP Obligations, subject to the limitations contained in this Article IV.

# ARTICLE V
# CONDITIONS PRECEDENT

5.01    **Conditions to Funding of the New Money DIP Loan**

The Lender's obligations to make the New Money DIP Loan are subject to the satisfaction or waiver of the following conditions precedent:

(a)    **Budget**. The Borrowers and the Lender must have agreed upon the Budget, and the Budget must have been delivered to the Lender and approved by the Bankruptcy Court in the Interim Order.

(b)    **Credit Agreement**. The Lender's receipt of executed counterparts of the DIP Loan Documents, properly executed by a Responsible Officer of the Borrowers and subject only to entry of the Interim Order.

(c)    **Resolutions**. The Lender's receipt of copies of resolutions, certificates of good standing, or other action, incumbency certificates, or other certificates from a Responsible Officer of the Borrowers, as the Lender may require, to evidence: (i) the identity, authority, and capacity of the Responsible Officer authorized to act in connection with the DIP Loan Documents, and (ii) the resolutions adopted by the Borrowers' Board of Directors for the purpose of approving the transactions contemplated by this Agreement, each in form and substance satisfactory to the Lender.

(d)    **Deposit Account Control Agreements**. The Lender's receipt of deposit account control agreements in form and substance acceptable to the Lender and signed by each of the Borrowers, on one hand, and each of [Bank OZK and Wells Fargo Bank], on the other hand, with respect to the Borrower's deposit accounts at [Bank OZK and Wells Fargo Bank].

(e)    **Financing Statement Searches**. Certified copies of financing statement searches dated no earlier than 30 days before the first Borrowing Request. These searches must be accompanied by written evidence, including any UCC termination statements, indicating that the Liens shown therein either constitute Permitted Liens or have been, or will be, terminated, or released in connection with the funding of the New Money DIP Loan.

(f)    **Evidence of Insurance**. The Lender's receipt of certificates of insurance and related endorsements from the Borrowers evidencing liability and casualty insurance. These certificates must name the Lender as an additional insured for liability insurance and as a loss payee for hazard insurance.

(g)    **No Litigation**. There must be no (i) material litigation pending, or to the Borrowers' knowledge, threatened in writing against or affecting the Borrowers, or (ii) injunction or other form of restraining order that restrains, restricts, or seeks to restrain or restrict the closing of this Agreement or the making of the Loans.

(h)    **Chapter 11 Cases**. The Chapter 11 Cases must have been commenced and drafts

of all "first day" motions (including those related to this Agreement, sale procedures, cash management, any critical vendor or supplier motions, or the assumption or rejection of leases) must have been provided to the Lender at least two days before their commencement, or if such notice is impracticable, then no later than concurrently with their provision to the Office of the United States Trustee.

(i)     **Interim Order**. The Interim Order must have been entered in a form and substance satisfactory to the Lender, at its sole and absolute discretion, and must not have been stayed, vacated, reversed, or rescinded. Without the Lender's prior written consent, given at its sole and absolute discretion, the Interim Order must not have been revised, amended, or modified. Additionally, any appeal of the Interim Order must not have been timely filed, and there must not be an effective stay of the Interim Order pending appeal.

5.02    **Conditions to Funding All Loans**

The Lender's obligations to make any Loans, including the New Money DIP Loan, are also subject to the satisfaction or waiver of the following conditions precedent:

(a)     **Accuracy of Representations and Warranties**. The Borrowers' representations and warranties, as outlined in Article VI of this document, any DIP Loan Document, or any document provided at any time under or in connection with the DIP Loan Documents, must be true and correct in all material respects (without duplicating any materiality qualifier contained within them) on the date of any Borrowing Request. If these representations and warranties specifically refer to an earlier date, they must be true and correct in all material respects (without duplicating any materiality qualifier contained within them) as of that earlier date.

(b)     **No Default**. No Default or Event of Default may exist or result from the making of these Loans or from the application of their proceeds.

(c)     **Borrowing Request**. The Lender must have received an executed Borrowing Request in accordance with the requirements of Section 2.02 of this Agreement.

(d)     **DIP Order**. With respect to any funding request made after the final hearing to consider approval of the DIP Order, the Final Order must have been entered in a form and substance satisfactory to the Lender, at its sole and absolute discretion, and must not have been stayed, vacated, reversed, or rescinded. Without the Lender's prior written consent, given at its sole and absolute discretion, the Final Order must not have been revised, amended, or modified. Additionally, any appeal of the Final Order must not have been timely filed, and there must not be an effective stay of the Final Order pending appeal.

(e)     **Material Adverse Event**. Other than the commencement of the Chapter 11 Cases, in the Lender's reasonable discretion, no Material Adverse Event must have occurred since the Petition Date.

(f)     **Milestones**. All Milestones outlined in Section 7.01 that are required to have been met by the date of each applicable Borrowing must have been achieved.

(g)     **Budget**. The Borrowers must be in compliance with the then-current Budget, taking

into account the variances permitted under Section 8.04, and must be using all Borrowings in compliance with the affirmative and negative covenants set forth in Sections 27.09 and 8.05.

(h)    **Valid Security Interest**. The Lender must have, as approved in the applicable DIP Order, a valid and perfected, priming, first-priority Lien on and security interest in the DIP Collateral pursuant to this Agreement and the DIP Order, subject to the Carve-Out.

(i)    **Payment of Lender Fees**. The Borrowers must have paid all of the Lender's Expenses that are due as outlined in Section 2.07 hereof.

(j)    **Compliance Certificate**. The Lender must have received a certificate, duly signed by a Responsible Officer of the Borrowers, certifying the conditions outlined in clauses (a)-(i) of this Section.

(k)    **Access to E-Books and Records**. The Borrowers must have complied with Sections 27.02(c) and (d).

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES**

Borrowers represent and warrant to the Lender as follows:

### 6.01    Existence, Qualification and Power

Each Borrower (a) is duly organized or formed, validly existing, and in good standing under the Laws of their respective jurisdictions of incorporation or organization; (b) upon entry of the DIP Order, has all requisite organizational power and authority, as well as all necessary governmental licenses, authorizations, consents, and approvals to own, pledge, mortgage, and operate its assets, to lease or sublease its assets, and to carry on its Business and execute, deliver, and perform its obligations under the DIP Loan Documents to which it is a party; and (c) is duly qualified, licensed, and in good standing under the Laws of each jurisdiction where its ownership, lease, or operation of assets, or the conduct of its Business, requires such qualification or license.

### 6.02    Authorization; No Contravention

Subject to entry of the DIP Order and to the extent not remedied by the entry of the DIP Order, the execution, delivery, and performance by Borrowers of each DIP Loan Document has been duly authorized by all necessary company or other organizational actions. These actions do not: (a) contravene the terms of any of the Borrowers' Organization Documents; (b) result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Material Contract or Lease to which the Borrowers are a party or that affects any Borrower or its assets; or (ii) any order, injunction, writ, or decree of any Governmental Authority or any arbitral award to which any Borrower or its assets is subject; (c) or violate any Law, except in each cases referred to in clause (c) where such violations could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Event.

### 6.03    Governmental Authorization; Other Consents

Except for the entry of the DIP Order, no Permit, approval, consent, exemption,

28

authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, any Borrower under this Agreement or any other DIP Loan Document other than: (a) those that have already been obtained and are in full force and effect; and (b) actions necessary to comply with the DIP Loan Documents on or after the Petition Date.

6.04   **Binding Effect**

Upon entry of the DIP Order, each Borrower will be deemed to have duly executed and delivered each applicable DIP Loan Document. Each DIP Loan Document constitutes a legal, valid, and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms. However, the enforceability of the DIP Loan Documents may be limited by: (a) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally; or (b) general equitable principles, whether enforcement is sought through proceedings in equity or at law.

6.05   **No Material Adverse Event**

(a)   Since the Petition Date, except as set forth in the Budget or disclosed in writing to the Lender on or before the Petition Date, no Borrower has: (a) Disposed of any material part of its Business or assets, whether voluntarily or involuntarily; or (b) purchased or otherwise acquired any business or assets, including any Equity Interests of any other Person, that is material to any Borrower.

(b)   Since the Petition Date, there has been no event or circumstance, whether individually or collectively, that has had or could reasonably be expected to result in a Material Adverse Event.

6.06   **Litigation**

Other than the Chapter 11 Cases, there are no material actions, suits, proceedings, claims, disputes, or investigations pending or, to the Borrowers' knowledge, threatened, whether at law, in equity, in arbitration, or before any Governmental Authority, involving any Borrower or any of their assets or revenues. This includes any actions, suits, proceedings, claims, disputes, or investigations that: (a) purport to affect or pertain to this Agreement, any other DIP Loan Document, the DIP Collateral, or any of the transactions contemplated by these documents; or (b) could reasonably be expected, individually or collectively, to result in a Material Adverse Event.

6.07   **Environmental Compliance**

(a)   To the Borrowers' knowledge, after reasonable inquiry, the Borrowers have not received any notice, report, or other information regarding an actual or alleged violation, non-compliance, liability, or potential liability related to Environmental Laws or Hazardous Materials concerning the Borrowers, their Business, or any of their past or present assets or facilities.

(b)   To the Borrowers' knowledge, after reasonable inquiry, the Borrowers have not handled, generated, treated, stored, transported, or disposed of any Hazardous Materials, except in the ordinary course of business and in compliance with all applicable Environmental Laws.

(c)     To the Borrowers' knowledge, after reasonable inquiry: (i) no judicial proceeding or governmental or administrative action is pending or threatened under any Environmental Law in which any Debtor is or may be named a party or with respect to the Business; and (ii) there are no consent decrees, judgements, consent orders, administrative orders, or similar decrees, orders, or administrative or judicial requirements outstanding under any Environmental Law with respect to the Business.

(d)     To the Borrowers' knowledge, after reasonable inquiry, the Borrowers are and have been for a period of two years before the Petition Date, in compliance with all applicable Environmental Laws.

6.08    **Insurance**

The Borrowers' assets and Business are insured with financially sound and reputable insurance companies that are not Affiliates. The insurance coverage is in amounts, with deductibles, and covering risks that are customarily carried by prudent companies of similar size, engaged in similar businesses, and owning similar assets in the localities where the applicable Borrower operates. All such insurance coverage is in full force and effect, and all premiums due have been paid. As of the date hereof, to the Borrowers' knowledge, after reasonable inquiry, no Borrower has received notice of violation or cancellation of any such insurance coverage, and there is no existing Default or event which, with the giving of notice or lapse of time or both, would constitute a Default by any insured under the insurance policies.

6.09    **Taxes**

To the Borrowers' knowledge, after reasonable inquiry: (a) the Borrowers have timely filed, or caused to be timely filed, all required federal, state, local, and other Tax returns and reports with the appropriate governmental authorities in the appropriate jurisdictions; (b) the Borrowers have timely paid all federal, state, local, and other Taxes levied or imposed upon them or their assets, income, or assets that are due and payable, except to the extent not required due to the filing of the Chapter 11 Cases or those being contested in good faith through appropriate proceedings diligently conducted, with adequate reserves provided in accordance with GAAP; and (c) no such Tax return or report is currently under audit or examination by any Governmental Authority.

6.010   **Disclosure**

The Borrowers have disclosed to the Lender all matters known to them, including all agreements, instruments, and corporate or other restrictions to which they are subject, that could reasonably be expected, individually or collectively, to result in a Material Adverse Event. To the Borrowers' knowledge, after reasonable inquiry, no representation or warranty made by them in this Agreement or any other DIP Loan Document contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein, taken as a whole and in light of the circumstances when made, not misleading.

6.011   **Compliance with Laws and Agreements**

To the Borrowers' knowledge, after reasonable inquiry, and subject to entry of the DIP Order, the Borrowers are in compliance with all applicable Laws and all binding orders, writs,

injunctions, and decrees except in instances where: (a) the requirement of the Law, order, writ, injunction, or decree is being contested in good faith through appropriate proceedings diligently conducted; or (b) the failure to comply could not, individually or collectively, reasonably be expected to result in a Material Adverse Event.

6.012    **Creation and Perfection of Security Interests in the DIP Collateral**

To the Borrowers' knowledge, upon its entry and subject to its terms, the provisions of the DIP Order are effective in creating a legal, valid, and enforceable first-priority, priming Lien in favor of the Lender on all rights, title, and interests of the Borrowers in each item of DIP Collateral except in for Permitted Liens, as set forth in the DIP Order, to the extent that such Permitted Liens would have priority over the security interest in favor of the Lender pursuant to any applicable Law.

6.013    **Labor Matters**

To the Borrowers' knowledge, there are no collective bargaining agreements or Multiemployer Plans covering the employees of any Borrower. Additionally, to the Borrowers' knowledge, after reasonable inquiry, as of the date hereof, the Borrowers are in compliance with all Laws relating to labor and employment.

6.014    **Permits**

To the Borrowers' knowledge, after reasonable inquiry: (a) they have all Permits needed to conduct their Business as it is currently conducted, and these Permits are in full force and effect; and (b) they are in compliance in all material respects with all of their Permits.

6.015    **Reorganization Matters**

(a)    The Borrowers commenced the Chapter 11 Cases on the Petition Date in accordance with applicable Law and will provide proper and timely notice of: (i) the motion seeking approval of the DIP Loan Documents and the DIP Order; (ii) the hearings for approval of the Interim Order and the Final Order; and (iii) all other matters for which notice is required to be given pursuant to the Interim Order or the Final Order.

(b)    Upon entry of the DIP Order and subject to its terms, the DIP Obligations will constitute allowed Superpriority Claims in the Chapter 11 Cases. These Superpriority Claims will have priority over all administrative expense claims and unsecured claims against the Borrowers, whether existing now or arising in the future, of any kind whatsoever, subject to the Carve-Out.

(c)    Upon the entry of the DIP Order and subject to its terms, the DIP Obligations will be secured by a valid and perfected, first-priority, priming Liens on all of the DIP Collateral, subject only to the Carve-Out.

(d)    The DIP Order is in full force and effect and has not been reversed, stayed, modified, or amended without the Lender's consent in its sole and absolute discretion.

(e)    The Budget delivered to the Lender was prepared in good faith based on the

assumptions stated therein, and the Borrowers believed, in good faith, that those assumptions were reasonable given the conditions that existed when the Budget was delivered. (The Parties understand that any projections or estimates made in the Budget are not to be viewed as facts, no assurance can be given that any such projections or estimates will be realized, and actual results could materially differ from projected results.)

(f)       Subject to and effective upon the entry of the DIP Order and subject to its terms, without the Lender's prior written consent and except to the extent of the Carve-Out: (i) no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, may be charged against or recovered from the DIP Collateral pursuant to either Bankruptcy Code section 105 or 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, or any other legal or equitable doctrine (including unjust enrichment) or similar principle of law; and (ii) in no event will the Lender be subject to surcharge under Bankruptcy Code section 506(b), the "equities of the case" exception contained in Bankruptcy Code section 552(b), the equitable doctrine of "marshaling," or any similar doctrine with respect to the DIP Collateral.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

The Borrowers covenant and agree, as long as the Lender has any New Money DIP Commitment under this Agreement, or any Loan or other Obligation under this Agreement remains unpaid or unsatisfied (excluding contingent indemnification obligations for which no underlying claim has been asserted), to comply with the provisions of this Article VII.

7.01   **Milestones**

The Borrowers must meet the following Milestones, unless extended or waived by the Lender at its sole and absolute discretion. (The Parties acknowledge that certain of the Milestones are subject to the Court's availability. If any Milestone cannot be met due to the Court's unavailability, that Milestone may be automatically extended by up to three Business Days, with corresponding extensions for subsequent Milestones).

(a)       Each Borrower must file a chapter 11 petition in the Bankruptcy Court no later than the **Petition Date**.

(b)       On the **Petition Date**, the Borrowers must file a motion seeking approval of the DIP Orders in form and substance acceptable to the Lender in all respects.

(c)       **By no later than 28 days after Petition Date**, the Borrowers must have filed, in form and substance acceptable to the DIP Lender at its absolute discretion, a Plan and Disclosure Statement and a motion seeking, among other things: (i) conditional approval of the Disclosure Statement; and (ii) a joint hearing for the Court to consider final approval of the Disclosure Statement and confirmation of the Plan.

(d)       By no later than the **five days following the Petition Date**, the Bankruptcy Court must have entered the Interim DIP Order, in form and substance acceptable to the Lender in all respects, approving the New Money DIP Loan and the Roll Up DIP Loan on an interim basis, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or

modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.

(e)       By no later than **35 days following the Petition Date**, the Bankruptcy Court must have entered the Final Order, in form and substance acceptable to the Lender in all respects, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.

(f)       By no later than **90 days after the Petition Date**, the Bankruptcy Court must have entered an order, in form and substance acceptable to the DIP Lender in all respects, confirming the Plan and Disclosure Statement, which must be in full force and effect and not have been vacated, reversed, stayed, amended, or modified except as otherwise agreed to in writing by the Lender at its sole and absolute discretion.

(g)       By no later than **120 days after the Petition Date**, the effective date of the Plan must have occurred.

7.02    **Restructuring Transaction**

The Borrowers will take all commercially reasonable actions needed to facilitate the prompt consummation of the Plan, including:

(a)       Not filing or supporting any pleading with the Bankruptcy Court that is materially inconsistent with the Plan without the Lender's written consent at its absolute discretion;

(b)       Using good faith efforts to cooperate with the Lender to develop a Plan that produces a tax-efficient outcome; and

(c)       To the extent any legal or structural impediment arises that would prevent, hinder, or delay consummation of the Plan, in consultation with the Lender, negotiating in good faith appropriate provisions to address such impediment;

(d)       Within three Business Days of receiving actual knowledge of any threatened or actual governmental or third-party complaint, litigation, investigation, or hearing that could prevent, hinder, or delay the consummation of the Plan, furnish written notice to the Lender and its counsel;

(e)       Not seeking, soliciting, or supporting an Alternative Transaction unless the Borrowers' Board of Managers determines in good faith, after consulting with outside counsel, that proceeding with the Plan would be inconsistent with the continued exercise of their fiduciary duties; and

(f)       Not engaging in any material transaction or making any material payment outside the ordinary course of business without the Lender's prior written consent, which consent may not be unreasonably withheld, conditioned, or delayed.

7.03    **Books and Records**

(a)       The Borrowers will maintain books of record and account that accurately and

materially reflect all financial transactions and matters involving their assets and Business in conformity with GAAP consistently applied.

(b)    The Borrowers will ensure their books of record and account comply with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers.

(c)    The Borrowers will provide the Lender with a current list of all platforms used by the Borrowers for accounting, managing cash and bank balances, and data management (such as labor management and inventory and sales tracking). The Borrowers must give the Lender at least seven Business Days written notice before any Borrower makes additions, deletions, or material alterations to these platforms.

(d)    The Borrowers will provide the Lender at all times with a unique username and password that grants continuous, real-time, read-only access to the Borrowers' deposit accounts and their cash and bank account information.

7.04    **Financial Information**

The Borrowers will deliver to the Lender and its counsel, in a form and in detail satisfactory to the Lender at its sole and absolute discretion, electronic copies of the following documents (unless the Lender expressly requests paper copies):

(a)    **Variance Reports.** A Variance Report, to be first delivered by 12:00 noon on the first Friday of the week following entry of the Interim Order and then by 12:00 noon each Friday thereafter.

(b)    **Financial Reports and Projections.** Copies of all monthly reports, projections, or other information regarding the Borrowers' Business, financial condition, or prospects that the Borrowers provide to any trustee (including UST as well as any monitor, examiner, or interim receiver) or Committee, to be delivered to the Lender concurrently with their provision to such Person.

(c)    **Audit Reports.** Copies of any audit reports, management letters, or recommendations submitted to any Borrower's Board of Directors or Managers (or any committee of the Board of Directors or Managers) by independent accountants in connections with any Borrower's accounts or books or any audit of any of them, to be delivered no later than five Business Days after receipt of such a request, or if impracticable, at such later date as agreed to by the Lender.

(d)    **Additional Information.** Any other information regarding the Borrowers' Business, financial condition, operations, or corporate affairs or their compliance with the terms of the DIP Loan Documents as requested by the Lender from time to time, to be delivered no later than five Business Days after receipt of such a request, or if impracticable, at such later date as agreed to by the Lender.

7.05    **Bankruptcy Notices**

The Borrowers will provide the Lender and its counsel with final or substantially final drafts of all motions or other documents at least two days before they are filed with the Bankruptcy Court but no later than contemporaneously with their delivery to any Committee or UST.

7.06    **Notice of Material or Adverse Events**

The Borrowers will, immediately upon any Responsible Officer becoming aware thereof, notify the Lender of:

(a)    The occurrence of any Default or Event of Default;

(b)    The occurrence of any Material Adverse Event;

(c)    Any material change in accounting policies or financial reporting practices by the Borrowers;

(d)    Any material breach or non-performance of, or any material Default under, a Contractual Obligation of any Borrower;

(e)    Any dispute, litigation, investigation, proceeding, or suspension between any Borrower and any Governmental Authority;

(f)    Any action, suit, proceeding, or claim alleging any Environmental Liability against any Borrower;

(g)    The commencement of, or any material development in, any litigation or proceeding affecting any Borrower, including pursuant to any applicable Environmental Laws;

(h)    Any judgment against any Borrower;

(i)    Any dispute, litigation, investigation, proceeding, or suspension between any Borrower and any Governmental Authority against or affecting any Borrower or Affiliate thereof with respect to any Sanctions;

(j)    Any adverse reports or notices received from any Governmental Authority pertaining to a Borrower including adverse reports or notices related to any Taxes of a Borrower, with such Borrower from any Governmental Authority, copies of which reports or notices must immediately be provided to the Lender;

(k)    The amendment of modification of any Organization Documents after the Petition Date or any notice of Default given or received by any Borrower under any Organization Document, copies of which amendments, modifications, or notices must immediately be provided to the Lender;

Each such notification must be accompanied by a statement of a Responsible Officer of the Borrowers that includes: (i) the details of the event referred to in the notification; (ii) the actions the Borrowers have taken and propose to take with respect to the event; and (iii) a description, with particularity, of any and all provisions of any DIP Loan Document that have been breached.

7.07    **Inspection Rights**

(a)    The Borrowers will permit the Lender's representatives and independent contractors to: (a) inspect any of their assets; (b) examine their corporate, financial, and operating records and make copies or abstracts of these records; and (c) discuss their affairs, finances, and accounts with their directors, officers, and independent public accountants.

(b)    The activities set forth in Section 7.06(a)  will be conducted at the expense of the Borrowers and, unless an Event of Default has occurred and is continuing, will be subject to the following conditions: (a) access need be granted only at reasonable times during the Borrowers' normal business hours; and (b) the Lender must provide reasonable advance written notice to the Borrowers.

(c)    In the event of an Event of Default, the Lender will have the right to access the Borrowers' assets, records, and personnel at any time, without advance notice and conduct more frequent and thorough inspections and examinations as deemed necessary by the Lender.

7.08    **Preservation of Existence**

(a)    The Borrowers will preserve, renew, and maintain their legal existence and good standing under the Laws of the jurisdiction in which they are organized.

(b)    The Borrowers will maintain all rights, privileges, permits, licenses, and franchises necessary or desirable for the normal conduct of their Business.

7.09    **Budget and Use of Loan Proceeds**

(a)    The Borrowers may use the Loan proceeds and credit accommodations provided in this Agreement and the DIP Loan Documents only in accordance with the Budget and the DIP Order. However, nothing in the Budget constitutes an amendment or modification of any DIP Loan Document or any Borrowing restrictions or lending limits set forth in this Agreement or in the DIP Order.

(b)    The Lender may assume that the Borrowers will comply with the Budget and has no duty to monitor such compliance.

(c)    The Lender is not required to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Budget or unpaid expenses that the Borrowers may have failed to include in the Budget.

(d)    The line items in the Budget for payment of interest, expenses, and other amounts to the Lender are estimates only. The Borrowers remain obligated to pay any and all DIP Obligations in accordance with the terms of the DIP Loan Documents and the DIP Order, regardless of whether such amounts exceed the estimates.

7.010    **Payment of Taxes and Other Obligations**

(a)    **Payment of Obligations**. Except to the extent expressly prohibited by any DIP

Loan Document or either excused or prohibited by the Bankruptcy Code as a result of the commencement and continuation of these Chapter 11 Cases, each of the Borrowers will pay and discharge, in the ordinary course of business, all of its obligations and liabilities, including:

(i)     All Taxes on it or its assets, or for which Borrowers have a withholding obligation, unless such Taxes are being contested in good faith by appropriate proceedings diligently conducted, adequate reserves in accordance with GAAP are being maintained by the Borrowers, and the failure to make the payment could not reasonably be expected to result in a Material Adverse Event.

(ii)    All lawful claims arising after the Petition Date that, if unpaid, would by Law become a Lien upon the Borrowers' assets (other than a Permitted Lien), unless the Borrowers are contesting such claim in good faith.

(iii)   All Indebtedness arising after the Petition Date, as and when due and payable, unless being contested by the Borrowers in good faith.

(b)     **Filing of Returns**. The Borrowers will properly and timely file all federal, state, local, and other required Tax returns related to its assets.

## 7.011  Maintenance of Property and Equipment

Except to the extent not permitted by or inconsistent with the Budget, each of the Borrowers will:

(a)     Use the standard of care typical in its industry to maintain, preserve, and protect all assets that are necessary or useful in operating its Business.

(b)     Maintain its equipment and other assets in good working order and condition, ordinary wear and tear excepted, including by making all necessary repairs, renewals, and replacements.

(c)     Use the standard of care typical in its industry in operating and maintaining its facilities.

## 7.012  Maintenance of Insurance

(a)     The Borrowers will maintain in full force and effect with financially sound and reputable insurance companies that are not Affiliates of the Borrowers all insurance policies currently protecting their assets and Business. These policies must provide coverage of the type and with the scope, amounts, and deductibles historically carried by the Borrowers and customarily carried by prudent companies of similar size, engaged in a similar business, and owning similar assets in the localities where the applicable Borrower operates. If possible and permitted under the Bankruptcy Code:

(i)     The Lender must be named as loss payee or mortgagee, as applicable, or an additional insured with respect to any such insurance.

(ii)    Such insurance must provide that no cancellation, amendment, or termination of coverage will be effective until after 30 days' notice to the Lender.

(iii)    Such insurance must provide that: (x) after the occurrence and during the continuance of an Event of Default, all proceeds will be payable to the Lender; and (z) no such insurance will be affected by any act or neglect of the insured or owner of the asset described in the policy.

(iv)    Each Borrower agrees to provide the Lender with at least 10 days prior written notice before any such policy or policies terminate or are renewed.

(b)    As long as no Event of Default has occurred and is continuing, the Borrowers have the right to adjust and compromise all claims under the insurance policies protecting their assets and Business and to receive the proceeds of such insurance, subject to the requirements of Article II of this Agreement. After the occurrence and during the continuance of an Event of Default, the Lender may adjust and compromise claims on such insurance policies. All loss recoveries received by the Lender under any such insurance will be applied to the DIP Obligations in the order set forth in Section 9.09 of this Agreement. The Lenders must deliver any surplus to the Borrowers.

(c)    If any Borrower fails to obtain or maintain the insurance required under Section 7.011(a) the Lender may obtain such insurance and pay the premium on behalf of the Borrowers. This payment will constitute part of the DIP Obligations and must be repaid by the Borrowers to the Lender.

(d)    The Borrowers will notify the Lender in writing of any casualty or other insured damage to any of the DIP Collateral. This notification must be provided as soon as practicable, but no later than 10 Business Days after a Responsible Officer of any Borrower becomes aware of such casualty or damage. The Borrowers will also ensure that the Net Cash Proceeds of any such event, whether in the form of insurance proceeds or otherwise, are collected and applied as required by the applicable provisions of this Agreement.

## 7.013  **Replacement/Substitution of Existing Workers' Compensation Insurance Policies**

[RESERVED]

## 7.014  **Compliance with Laws**

Except to the extent prohibited or excused under the Bankruptcy Code, the Borrowers and their directors, officers, employees, and agents will comply with all applicable Laws, regulations, Permits, orders, writs, injunctions, and decrees, including Environmental Laws, Anti-Corruption Laws, Anti-Terrorism Laws, Anti-Money Laundering Laws, Sanctions, the Bank Secrecy Act, and the Patriot Act. They will also maintain policies and procedures designed to promote and ensure such compliance. This obligation applies unless the requirements are being contested in good faith through appropriate proceedings diligently conducted, and the failure to comply could not, individually or collectively, reasonably be expected to result in a Material Adverse Event.

## 7.015  **ERISA Compliance**

Except to the extent prohibited or excused under the Bankruptcy Code, the Borrowers will, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each ERISA Plan in compliance with the applicable provisions of ERISA, the Tax Code and other federal or state Law; (b) cause each ERISA Plan that is qualified under Section 401(a) of the Tax Code to maintain such qualification; (c) make all required contributions to any ERISA Plan subject to Section 412 of the Tax Code, except as could not reasonably be expected to result in a Material ERISA Event; and (d) take no actions that could reasonably be expected to result in an ERISA Event, except as could not reasonably be expected to result in a Material ERISA Event.

## 7.016   **Environmental Compliance**

(a)    The Borrowers will comply with all Environmental Laws and Environmental Permits applicable to properties owned, leased, or occupied by the Borrowers, and they will use commercially reasonable efforts to ensure that any lessees and other Persons occupying properties leased from the Borrowers comply with these laws and permits.

(b)    The Borrowers will not Release or threaten to Release any Hazardous Material on, under, about, or from any properties that they own, lease, or occupy, except in compliance with all applicable Environmental Laws.

(c)    The Borrowers will timely obtain and renew all Environmental Permits applicable to their operations and properties.

(d)    The Borrowers will undertake and perform any cleanup, removal, remedial, or other actions needed to address a Release of Hazardous Materials at, on, or from any of their current or former properties in accordance with applicable Environmental Laws.

## 7.017   **Pledged Assets**

(a)    **Equity Interests.** The Borrowers will ensure that 100% of the issued and outstanding Equity Interests of each of their directly owned Subsidiaries are subject at all times to a first-priority, perfected Lien in favor of the Lender. The Borrowers will also make any filings and deliveries that are necessary or desirable to perfect the security interests therein, all in form and substance satisfactory to the Lender.

(b)    **Other Property**. The Borrowers will deliver any documentation necessary or requested by the Lender in connection with the DIP Collateral. This includes appropriate UCC-1 financing statements, resolutions, other organizational and authorizing documents, and other items reasonably requested by the Lender, all in a form, content, and scope satisfactory to the Lender.

## 7.018   **Condemnation**

The Borrowers will promptly notify the Lender in writing of the commencement of any action or proceeding for the taking of DIP Collateral, or any part thereof, or any interest therein, under the power of eminent domain, condemnation, or similar proceeding. The Borrowers will also ensure that the Net Cash Proceeds of any such event, whether in the form of condemnation awards or otherwise, are collected and applied as required by the applicable provisions of this Agreement.

39

7.019  **Liquor Licenses**

(a)      **Perfection Requirements.** The Borrowers shall promptly and diligently take all necessary actions to perfect the security interest and Liens in the liquor licenses and any Proceeds thereof, including filing any required notices or applications with the appropriate Governmental Authorities, obtaining any necessary consents or approvals, and complying with all applicable laws and regulations governing the transfer or encumbrance of liquor licenses.

(b)      **Proceeds**. All proceeds from the sale, transfer, or assignment of any liquor licenses shall be deposited into a designated account and shall be subject to the security interest granted herein. Such proceeds shall be used first to satisfy any outstanding DIP Obligations, and any remaining amounts will be handled in accordance with the terms of the DIP Order and any other applicable agreements.

(c)      **Compliance with Laws**: The Borrowers shall ensure that the sale, transfer, or assignment of any liquor licenses complies with all applicable laws and regulations, including obtaining any necessary consents or approvals from governmental authorities.

7.020  **Further Assurances**

At the Lender's request, the Borrowers must, at their own expense, promptly execute and deliver, or cause to be executed and delivered, any additional agreements, documents, or instruments necessary to effectuate the provisions or purposes of any of the DIP Loan Documents.

## ARTICLE VIII
## NEGATIVE COVENANTS

The Borrowers covenant and agree, as long as the Lender has any New Money DIP Commitment under this Agreement, or any Loan or other Obligation under this Agreement remains unpaid or unsatisfied (excluding contingent indemnification obligations for which no underlying claim has been asserted), to comply with the provisions of this Article VIII.

8.01   **No Agreements Restricting the DIP Loan Documents or Liens Thereunder**

(a)      No Borrower will enter into or allow any Contractual Obligation that restricts its ability to: (i) pledge its assets according to the DIP Loan Documents or any renewals, refinancings, exchanges, refunds, or extensions of these documents; or (b) act as a Borrower under the DIP Loan Documents or any renewals, refinancings, exchanges, refunds, or extensions of these documents. For clarity, these restrictions do not apply to the DIP Loan Documents themselves or any Permitted Lien or document governing a Permitted Lien, provided that the restriction applies only to the specific asset(s) under the Permitted Lien.

(b)      No Borrower will enter into or allow any Contractual Obligation that: (i) prohibits or restricts the existence of any Lien on its assets in favor of the Lender to secure the DIP Obligations, whether the assets are currently owned or hereafter acquired; or (ii) requires the grant of any security for any obligation if such assets are given as security for the DIP Obligations. For clarity, these restrictions do not apply to any Permitted Lien or any document governing a Permitted Lien, provided that the restriction applies only to the specific asset(s) under the Permitted Lien.

8.02   **No Liens Other Than Permitted Liens**

The Borrowers will not create, incur, assume, or allow any Lien on any of their assets or revenues, whether currently owned or hereafter acquired, except for the following:

(a)    **DIP Loan Liens.** Liens pursuant to any DIP Loan Documents or arising under the DIP Order.

(b)    **Prior Perfected Liens.** Liens existing on the Petition Date and listed on *Schedule 8.02* or that become validly perfected after the Petition Date as permitted by Bankruptcy Code section 546(b).

(c)    **Bank Setoff Rights.** Normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions.

(d)    **Minor Encumbrances.** Encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not materially affect the value of the assets encumbered or impair the Borrowers' ability to use such assets in their Business, and none of which is violated by existing or proposed structures or land use.

(e)    **Tax Liens.** Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings diligently conducted, provided that adequate reserves are maintained on the books of the applicable Borrower in accordance with GAAP.

(f)    **Statutory or Common Law Liens.** Statutory or common law Liens arising in connection with landlords, carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, or other similarly situated Persons imposed by applicable Law and that have arisen in the ordinary course of business, secure amounts not overdue for more than thirty days, or are in the process of being contested in good faith by appropriate proceedings, including in connection with the Chapter 11 Cases, provided that reserves, if required by GAAP, have been made for any such contested amounts.

8.03   **Indebtedness**

(a)    **Additional Indebtedness.** Notwithstanding anything to the contrary in any DIP Loan Document, no Borrower may in any circumstance incur any additional Indebtedness that is *pari passu* or senior in right of payment or security to the DIP Obligations or the obligations under this Agreement or create, incur, assume, or allow any Indebtedness to exist, except for the following:

(i)    **The Loans.** Indebtedness under the DIP Loan Documents or incurred pursuant to the DIP Order.

(ii)    **Netting and Overdraft Protection.** Unsecured Indebtedness incurred in the ordinary course of business in connection with netting or overdraft protection services.

(iii)    **Performance and Surety Bonds.** Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees, and similar obligations provided in the ordinary course of business, including those incurred to secure

health, safety, and environmental obligations.

(iv)    **Accounts Payable.** Unsecured Indebtedness incurred by any Borrower in the ordinary course of business and consistent with the Budget (including permitted variances).

(b)    **Superpriority Claims or Liens.** The Borrowers will not incur, create, assume, allow, permit, or seek Court approval of any superpriority claim or a Lien on any DIP Collateral that is equal or senior to the DIP Obligations or the Liens securing the DIP Obligations, the Liens securing the Prepetition Obligations, or any Liens granted by the Bankruptcy Court as adequate protection to the Lender in its role as a prepetition lender, except for: (i) the Carve-Out; and (ii) the adequate protection Liens and claims of the Lender against the Borrowers in its role as a prepetition lender.

(c)    **Subordinated Indebtedness.** No Borrower will amend any document, agreement, or instrument evidencing any Indebtedness that is subordinated to the DIP Obligations, except for amendments or modifications that do not negatively affect any subordination or payment provisions with respect to the Lender and that are otherwise not adverse to the Lender.

(d)    **Payment of Indebtedness.** No Borrower will, directly or indirectly, make any payment, prepayment, or redemption of any Indebtedness, or repurchase, redeem, retire, or otherwise acquire any Indebtedness of any other Borrower, except for the DIP Obligations.

8.04    **Budget Covenant**

Each line item in the Budget is subject to a permitted negative variance of:

(a)    **15% per week** above the projected aggregate disbursements set forth in the Budget;

(b)    **15% per four-week period**, then ending, on the revenue set forth in the Budget.

Any unused amounts in the Budget during any one-week period may be carried forward to future weekly periods. These carried-forward amounts may be applied to any excess expenditures in the same line item relative to the projected line as set forth in the Budget, such that the cumulative-to-date budgeted amount for each line item is available without causing future weekly periods to exceed the allowable variance. Each line item in the Budget is subject to a maximum amount for each particular week, as specified in the Budget.

8.05    **Budget and Use of Loan Proceeds**

(a)    No portion of the Loan proceeds or credit accommodations, including any Borrowing, the Carveout, the DIP Collateral, or its proceeds, may be used for the investigation (including discovery proceedings or informal information requests), initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Lender or its Related Parties.

(b)    Absent the Lender's written consent at its reasonable discretion, no Borrower may

make any Capital Expenditure other than in accordance with the Budget and the DIP Order.

(c)      Unless approved by the Lender, within the limits of the Budget, and authorized pursuant to a Bankruptcy Court Order, no Borrower may:

(i)      Make any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim;

(ii)      Make any payments on account of claims or expenses arising under Bankruptcy Code section 503(b)(9); or

(iii)      Make any payments on account of claims or expenses arising under Bankruptcy Code section 503(c).

(d)      Absent the Lender's written consent at its sole and absolute discretion, no Borrower may make payments to an Affiliate or pay compensation or make other payments to any director, officer, or manager of a Borrower or Affiliate of a Borrower other than as provided for in the Budget. For clarity, the Budget provides for normal and reasonable compensation and expense reimbursements for directors, officers, and managers, paid in the ordinary course of business and consistent with prior practices, including hourly compensation or base salaries and bonuses to non-officer vice presidents, operations directors, and managers under the *Field Operations Regional Leadership Bonus Plan* and the *Support Center and Field Operations Bonus Plans* as they were in effect 90 days before the Petition Date. The Budget does not allow for payments to directors or corporate officers under any bonus plan, incentive or retention program, individual incentive or retention bonuses, or other extraordinary payments or bonuses.

8.06    **Material Changes**

(a)      **Dispositions.** No Borrower will merge, dissolve, liquidate, or consolidate with or into another entity or Dispose of all or substantially all of its assets, whether in a single transaction or a series of transactions, except as permitted by the Lender in its sole and absolute discretion.

(b)      **Subsidiaries.** No Borrower will acquire, organize, or form any new Subsidiary.

(c)      **Material Contracts or Leases.** No Borrower will amend, modify, change, or reject any Material Contract or Lease without the Lender's prior written consent at its reasonable discretion.

(d)      **Organizational Documents.** No Borrower, without the Lender's prior written consent at its reasonable discretion, will amend, modify, or change its Organization Documents, its Fiscal Year, or its name, jurisdiction of formation, or type of entity.

8.07    **Dispositions**

The Borrowers will not make any Disposition except for Permitted Dispositions except as permitted by the Lender in its sole and absolute discretion.

8.08    **Restricted Payments**

The Borrowers will not declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

8.09   **Insider and Affiliated Party Transactions**

The Borrowers will not, without the Lender's written consent at its sole and absolute discretion, enter into or permit to any transaction or series of transactions with any director, officer, manager, or Affiliate of the Borrowers, except for the following:

(a)   Advances of working capital to any such Person as otherwise permitted under this Agreement.

(b)   Transfers of cash or assets to, and other transactions between or among, any such Person otherwise permitted under this Agreement.

8.010   **Intercompany Transactions**

Unless expressly allowed by the DIP Loan Documents or consented to by the Lender in writing at its sole and absolute discretion:

(a)   No Borrower will pay dividends or make distributions on its Equity Interests or profits.

(b)   No Borrower will pay any Indebtedness or other obligation owed to another Borrower or Affiliate.

(c)   No Borrower will make loans or advances to any other Borrower or Affiliate.

(d)   No Borrower will sell, lease, or transfer any of its assets to another Borrower or Affiliate.

8.011   **Ownership of Subsidiaries**

No Borrower will: (a) permit any Person (other than any other Borrower) to own any Equity Interests of any Subsidiary of any Borrower; (b) create, incur, assume, or allow any Lien on any Equity Interests in any Subsidiary of any Borrower, except for Permitted Liens; or (c) enter into any joint venture, partnership, or similar arrangement.

8.012   **Compliance with Laws**

(a)   **Sanctions.** No Borrower will:

(i)   Permit any Loan or Loan proceeds, directly or indirectly, to be used, lent, contributed, or otherwise made available: (x) to any Sanctioned Person or any Person in a Sanctioned Country, (y) to fund any activity or business of a Sanctioned Person or Person in a Sanctioned Country; or (z) in any other manner that will result in any violation of any Sanctions.

(ii)   Fund all or part of any payment under this Agreement using proceeds or

44

assets of a Sanctioned Person or assets that are directly or indirectly derived from transactions that would cause a violation of any Sanctions.

(b)      **Anti-Corruption Laws.** No Borrower will permit any Loan or Loan proceeds, directly or indirectly, to be used, lent, contributed, or otherwise made available for an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law, including the United States Foreign Corrupt Practices Act of 1977, as amended.

## 8.013   Commencement of Lender Actions

The Borrowers will not initiate any adversary proceeding, contested matter, or other legal action against the Lender asserting any claims or defenses arising from or relating to the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection with the Prepetition Loan Documents, or otherwise challenging or related to the transactions contemplated thereby.

## 8.014   Restrictions on Investments

The Borrowers will not make any Investments except:

(a)      **Cash or Cash Equivalents.** Investments in the form of cash or cash equivalents.

(b)      **Pre-Petition Investments.** Investments existing on the Petition Date.

(c)      **Intercompany Balances.** Investments by any Borrowers in any other Borrowers.

## 8.015   Speculative Transactions

The Borrowers will not engage in any transaction involving commodity options, swap contracts, or similar speculative transactions.

## 8.016   Amendments to the DIP Order

The Borrowers will not amend, supplement, or otherwise modify the DIP Order without the Lender's written consent at its sole and absolute discretion.

## ARTICLE IX
## EVENTS OF DEFAULT AND REMEDIES

## 9.01   Events of Default

Any of the following constitutes an "**Event of Default**":

(a)      **Non-Payment.** The Borrowers fail to pay any amounts when due, as required by this Agreement or any other Loan Document, including principal of any Loan, interest on any Loan, premiums, fees, or any other amounts payable.

(b)      **Covenants.**

(i)    **General.** The Borrowers fail to perform or observe: (i) any term, covenant, or agreement contained in any DIP Loan Documents, *provided that* such failure has not has not been remedied or waived within five Business Days after the Borrowers receive written notice from the Lender; or (ii) any term, covenant, or agreement contained in Article VII (Affirmative Covenants) or Article VIII (Negative Covenants) of this Agreement.

(ii)    **Milestones.** A Milestone under Section 7.01 is not met. The Parties acknowledge that the failure to meet any Milestone may be waived by the Lender at its sole and absolute discretion but, notwithstanding anything to the contrary herein, is not subject to remedy or cure by the Borrowers.

(c)    **Representations and Warranties.** Any representation, warranty, certification, or statement of fact made or deemed made by or on behalf of the Borrowers in the DIP Loan Documents or in any other document delivered in connection with the DIP Loan Documents is incorrect or misleading. A representation, warranty, certification, or statement of fact is considered incorrect or misleading if (i) it is expressly qualified by materiality or pertains to the occurrence or non-occurrence of a Material Adverse Event and is incorrect or misleading in any respect when made or deemed made; or (ii) it is not expressly qualified by materiality and does not pertain to a Material Adverse Event and is incorrect or misleading in any material respect when made or deemed made.

(d)    **Material Adverse Event**. A Material Adverse Event occurs or is reasonably likely to occur or the Borrowers fail to provide timely notice to the Lender of any Material Adverse Event as required under Section 7.05 of this Agreement.

(e)    **Budget Compliance.** The Borrowers fail to comply with the Budget, subject to the permitted variances as set forth in Section 8.04 of this Agreement. For the avoidance of doubt, an Event of Default shall occur if the Borrowers exceed the permitted negative variance of (i) 15% per week above the projected aggregate disbursements set forth in the Budget or (ii) 15% per four-week period on the revenue set forth in the Budget."

(f)    **Impairment of the DIP Loan Documents, DIP Order, or DIP Collateral.**

(i)    After execution and delivery, any DIP Loan Document ceases to be in full force and effect for any reason other than as expressly permitted therein or upon full satisfaction of all DIP Obligations.

(ii)    Any Borrower contests the validity or enforceability of any DIP Loan Document or purports or attempts to revoke, terminate, or rescind any DIP Loan Document.

(iii)    A Borrower files a motion seeking an order impairing the DIP Collateral or if such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.

(iv)    Any Entity files or supports a motion, application, or adversary proceeding or challenging or otherwise contests the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Prepetition Loan Documents

or Prepetition Obligations or asserts any other cause of action against the Lender with respect or relating to such claims or the prepetition liens securing such claims.

(v)     After its entry, the DIP Order (for any reason other than pursuant to its terms) ceases to create a valid and perfected Lien with security interests in all DIP Collateral with the priority specified therein, subject to Permitted Liens under Section 8.02.

(vi)     The Bankruptcy Court enters an order without the Lender's express prior written consent that: (a) revokes, reverses, stays, modifies, supplements, or amends any of the DIP Orders, (b) permits any administrative expense or claim (existing now or arising in the future, of any kind or nature) to have administrative priority over or equal to the Lender's priority concerning the DIP Obligations, or (c) grants or permits the grant of a Lien on the DIP Collateral other than a Permitted Lien.

(vii)     A motion is filed seeking an order authorizing the use of cash collateral without the Lender's prior written consent.

(viii)     A motion is filed seeking an order authorizing the use of DIP Collateral, or financing or loans secured by liens that are senior, *pari passu*, or junior to the Lender's Liens on DIP Collateral, without the Lender's prior written consent.

(g)     **Judgments.**

(i)     Either: (x) one or more final judgments or orders for the payment of money in an aggregate amount exceeding $50,000, to the extent not covered (subject to normal deductibles) by independent third-party insurance as to which the insurer does not dispute coverage or (y) one or more non-monetary final judgments that have, or could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Event, are entered against any Borrower; and

(ii)     There is a period of 30 consecutive days during which either (x) Enforcement proceedings are commenced by any creditor upon such judgment or order, and such proceedings remain unstayed or undismissed; or (y) a stay of enforcement of such judgment, by reason of a pending appeal, the Chapter 11 Cases, or otherwise, is not in effect.

(h)     **Cross-Default.** With respect to any Indebtedness or Guarantee (other than Indebtedness under this Agreement) with an aggregate principal amount exceeding $50,000, except to the extent a payment obligation is stayed or excused under the Bankruptcy Code or is subject to a good faith dispute:

(i)     The Borrowers fail to make any payment when due, beyond any applicable grace period. This includes undrawn committed or available amounts and amounts owed to all creditors under any combined or syndicated credit arrangement.

(j)     The Borrowers fail to observe or perform any other agreement or condition related to such Indebtedness or Guarantee, or contained in any instrument or agreement evidencing, securing, or relating to it.

(k)        Any other event occurs that causes, or permits the holder(s) of such Indebtedness or the beneficiary(ies) of such Guarantee (or a trustee or agent on their behalf) to demand, or cause the Indebtedness to become due, be repurchased, prepaid, defeased, or redeemed (automatically or otherwise), or to make an offer to repurchase, prepay, defease, or redeem such Indebtedness before its stated maturity, with the giving of notice if required.

(l)        **Relief from the Automatic Stay.** The Bankruptcy Court enters an order that grants relief from the Automatic Stay to any creditor of any Borrower for any claim equal to or exceeding $50,000 and which is not stayed pending appeal.

(m)        **Voluntary Insolvency Proceedings**. Any Borrower engages in any of the following actions:

(i)        Institutes or consents to the institution of any proceeding under any Debtor Relief Law (other than the Chapter 11 Cases);

(ii)        Makes an assignment for the benefit of creditors; or

(iii)        Applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer for itself or for all or any material part of its assets.

(n)        **Involuntary Insolvency Proceedings.**

(i)        Any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer is appointed without the application or consent of a Borrower, and the appointment continues undischarged or unstayed for 60 calendar days.

(ii)        Any proceeding under any Debtor Relief Law relating to a Borrower or to all or any material part of its assets is instituted without the consent of a Borrower, and the proceeding continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding.

(o)        **Appointment of a Trustee.**

(i)        A Borrower files a motion seeking an order appointing a trustee or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.

(ii)        The Bankruptcy Court enters an order appointing, or any Borrower files an application for an order seeking the appointment of, either a trustee pursuant to Bankruptcy Code section 1104 or an examiner or other responsible Person or officer with enlarged powers under Bankruptcy Code section 1106(b) beyond those specified  in Bankruptcy Code section 1106(a)(3) and (4), particularly relating to the operation of the Business.

(p)        **Conversion of the Chapter 11 Cases to Chapter 7**

(i)        A Borrower files a motion seeking an order converting a Chapter 11 Case

to a case under Chapter 7 or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.

(ii)     The Bankruptcy Court enters an order converting any Chapter 11 Case to a chapter 7 case.

(q)     **Dismissal of the Chapter 11 Cases**

(i)     A Borrower files a motion seeking an order appointing a trustee or dismissing a Chapter 11 Case or such a motion is filed by a Person other than the Borrowers and the Borrowers do not contest it in good faith.

(ii)     The Bankruptcy Court enters an order dismissing any of the Chapter 11 Cases without including provisions that terminate the New Money DIP Commitments and ensure full payment, in cash, of all DIP Obligations upon entry of such order.

(r)     **Confirmation of a Chapter 11 Plan.** The Bankruptcy Court confirms a Plan that does not provide for the continuation of the Liens and security interests granted to the Lender under this Agreement until the Plan's Effective Date and the termination of the New Money DIP Commitments and the indefeasible payment in full, in cash, of all DIP Obligations and Prepetition Obligations on or before the Plan's Effective Date.

## 9.02   **Preservation and Protection of DIP Collateral**

Upon the occurrence and during the continuance of an Event of Default, the Lender will have the right, but not the obligation, to pay any amount or perform any act required of any Borrower under this Agreement or any other DIP Loan Document (excluding principal, interest, or fees on the Advances) to preserve, protect, maintain, or enforce the DIP Obligations, the DIP Collateral, or the Liens securing the DIP Obligations, if the Borrowers fail to do so. This includes, but is not limited to, the payment of:

(a)     Any judgment against a Borrower;

(b)     Any insurance premium;

(c)     Any landlord's or bailee's claim; or

(d)     Any other obligation with respect to the DIP Collateral.

All payments made by the Lender under this section, along with all related out-of-pocket costs and expenses it incurs, will be considered part of the DIP Obligations. Any payment made or action taken by the Lender under this section will not prejudice the Lender's right to assert an Event of Default and to proceed accordingly.

## 9.03   **Acceleration and Termination of the Loans**

If any Event of Default occurs and is continuing, the Lender may take any or all of the following immediate actions:

(a)     **Declare Immediate Payment:** Declare the unpaid principal amount of all outstanding Loans, all accrued and unpaid interest, premiums, fees, and other amounts owing or payable under this Agreement or any other DIP Loan Document to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by the Borrowers.

(b)     **Terminate New Money DIP Commitments:** Declare the New Money DIP Commitments terminated, whereupon the New Money DIP Commitments will immediately terminate, except as provided in Section 9.08.

(c)     **Terminate Future Liabilities:** Terminate the DIP Loan Documents as to any future liability or obligation of the DIP Lender, subject to the obligations in Section 9.08, but without affecting any of the Lender's Liens in the DIP Collateral and without affecting the DIP Obligations.

### 9.04    Enforcement of Lender's Rights and Remedies

If any Event of Default occurs and is continuing, the Lender shall Provide five Business Days' notice (the "**Notice Period**") of the occurrence of the Event of Default and termination of the Automatic Stay to counsel to the Borrowers, the UST, and the Committee (if any), which notice may be sent by email. During the Notice Period, the Borrowers may attempt to cure such Event of Default, if feasible, seek a written waiver of the Event of Default from the Lender at its sole and absolute discretion, or request a hearing regarding the Event of Default. Unless either the Bankruptcy Court issues an order to the contrary or the Lender waives the Event of Default before the Notice Period expires, the Automatic Stay will automatically terminate upon the termination of the Notice Period, from which time the Lender may exercise the rights and remedies set forth in this Section 9.04 in addition to any and all other rights and remedies with respect to the DIP Collateral and available under the DIP Loan Documents, the UCC and other applicable Law, or equity. If any Person requests a hearing to seek to prevent the Lender from exercising its rights and remedies following an Event of Default, the sole issue before the Bankruptcy Court at such a hearing will be whether an Event of Default has occurred and has not been cured. No other issue or argument will be relevant to any opposition to the enforcement of the Lender's rights.

(a)     The Lender may take possession of, foreclose on, or request a receiver for the DIP Collateral. The Lender may keep the DIP Collateral on any Borrower's premises at no cost to the Lender or remove any part of it to a location of the Lender's choosing. Upon the Lender's demand, the Borrowers, at their own expense, must assemble the DIP Collateral and make it available to the Lender at a location reasonably convenient for the Lender.

(b)     The Lender may exercise set-off rights on cash collateral or deposits (other than Excluded Accounts).

(c)     The Lender may sell and deliver any DIP Collateral at public or private sales, for cash, on credit, or otherwise, at prices and terms the Lender deems advisable. The Lender may also postpone or adjourn any sale of the DIP Collateral by announcing the postponement or adjournment at the time and place of the original or rescheduled sale.

(d)     The Lender may hold, lease, develop, manage, operate, control, and otherwise use

the DIP Collateral on terms and conditions that are reasonable under the circumstances. This includes making repairs, alterations, additions, and improvements, and taking other actions that may be reasonably necessary or desirable. The Lender may exercise all rights and powers of each Borrower with respect to the DIP Collateral, whether Borrower's name or otherwise. This includes the right to make, cancel, enforce, or modify leases, obtain and evict tenants, and demand, sue for, collect, and receive all rents.

(e)    The Lender may take any actions reasonably necessary or desirable in connection with the DIP Collateral, including preparing for its Disposition. All reasonable and documented out-of-pocket fees and expenses incurred in connection with these actions will be borne by the Borrowers. Upon the Lender's written demand, the applicable Borrower must direct the grantor or licensor of, or contracting party to, any property agreement to recognize and accept the Lender as the party to such agreement for all purposes, as fully as it would recognize and accept the Borrower and its performance. In such an event, and without further notice or demand, the Lender may exercise all rights of the Borrower under such agreements at the Borrower's sole cost and expense.

## 9.05    Lender's Rights and Remedies with Respect to DIP Collateral

(a)    **Notice of Sale or Disposition.** Each Borrower agrees that any notice by the Lender of sale, Disposition, or other intended action under this Agreement, whether required by the UCC or otherwise, will constitute reasonable notice if delivered by registered or certified mail, return receipt requested, postage prepaid, or delivered personally against receipt, at least five Business Days before such action, to the Borrowers' addresses specified in Section 10.02. This provision does not require notice to be given in the specified manner but ensures that such notice will be deemed reasonable if it is.

(b)    **Credit for Sale of DIP Collateral.** If any DIP Collateral is sold on terms that do not require full payment at the time of sale, no credit will be applied against the DIP Obligations until the Lender receives payment. If the buyer Defaults on the payment, the Lender may resell the DIP Collateral.

(c)    **Judicial Process for Possession of DIP Collateral.** If the Lender seeks to take possession of all or any portion of the DIP Collateral through judicial process, each Borrower irrevocably waives, to the extent permitted by applicable Law: (i) the requirement to post any bond, surety, or security that might otherwise be required; (ii) any demand for possession before any suit or action to recover the DIP Collateral is commenced; and (iii) any requirement that the Lender retain possession and not dispose of any DIP Collateral until after trial or final judgment.

(d)    **No Obligation to Preserve Rights or Marshal Collateral.** Each Borrower agrees that the Lender has no obligation to preserve rights to the DIP Collateral or marshal any DIP Collateral for the benefit of any Person, and neither the DIP Collateral nor the application of its proceeds is subject to the equitable doctrine of "marshaling" or any similar doctrine.

(e)    **Use of Borrowers' Intellectual Property.** The Lender is hereby granted a license or other right to use, without charge, each Borrower's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar assets, in completing production of, advertising or selling any DIP Collateral, and each such Borrower's rights under all licenses and all

franchise agreements will inure to the Lender's benefit for such purpose.

(f)    **Application of Sale Proceeds.** The proceeds of sale will be applied as required pursuant to Section 2.03(c) and 2.04.

9.06    **Private Sale of DIP Collateral**

(a)    **Restrictions on Public Sale.** Each Borrower recognizes that the Lender may be unable to effect a public sale of any or all of the DIP Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such DIP Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.

(b)    **Acknowledgment of Private Sale Terms.** Each Borrower acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale will, to the extent permitted by applicable Law, be deemed to have been made in a commercially reasonable manner.

(c)    **No Obligation to Delay Sale**. Unless required by applicable Law, the Lender will not be under any obligation to delay a sale of any of such DIP Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so.

(d)    **Compliance with Applicable Laws.** Each Borrower further agrees to do or cause to be done, to the extent that such Borrower may do so under applicable Law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such DIP Collateral or other assets to be sold valid and binding and in compliance with any and all applicable laws at such Borrower's expense.

(e)    **Specific Performance and Irreparable injury.** Each Borrower further agrees that a breach of any of the covenants contained in this Section 9.06 will cause irreparable injury to the Lender for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 9.06 will be specifically enforceable against such Borrower, and each Borrower hereby waives and agrees, to the fullest extent permitted by Law, not to assert as a defense against an action for specific performance of such covenants that (i) such Borrower's failure to perform such covenants will not cause irreparable injury to the Lender or (ii) the Lender has an adequate remedy at law in respect of such breach.

(f)    **Liquidated Damages.** Each Borrower further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Lender by reason of a breach of any of the covenants contained in this Section 9.06 and, consequently, agrees that, if such Borrower will breach any of such covenants and the Lender will sue for damages for such breach, such Borrower will pay to the Lender, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the DIP Collateral or other assets to be sold on the date the Lender will

demand compliance with this Section 9.06.

9.07   **Equity Interest Collateral**

(a)      **No Obligation to Take Title or Possession.** In connection with the exercise of any rights or remedies in respect of, or foreclosure or realization upon, any Equity Interest Collateral pursuant to this Agreement or any other Loan Document, the Lender will not be obligated to take title to or possession of such Equity Interests, as the case may be, in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability.

(b)      **Environmental Liability Considerations**. In the event that the Lender deems that it may be considered an "owner or operator" under any environmental laws or otherwise cause the Lender to incur, or be exposed to, any Environmental Liability or any liability under any other Law, the Lender reserves the right, instead of taking such action, to arrange for the transfer of the title or control of the asset to a court appointed receiver.

(c)      **Lender's Immunity from Environmental Claims**. The Lender will not be liable to any Person for any Environmental Liability or any environmental claims or contribution actions under any Law by reason of the Lender's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

9.08   **Carve Out Reserve Funding**

Upon the occurrence of an Event of Default, the Borrowers may use the proceeds of the New Money DIP Loans or cash collateral to fund, subject to the Budget, the Carve-Out and the Carve-Out Reserve (as defined in the DIP Order).

9.09   **Application of Funds**

After the exercise of remedies provided for in Article IX (or after the Loans have automatically become immediately due and payable), any amounts received on account of the DIP Obligations must be applied by the Lender in the following order:

(a)      **First**, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses, and other amounts (including fees, charges, and disbursements of counsel to the Lender and amounts payable under Article III) payable to the Lender;

(b)      **Second**, to payment of that portion of the DIP Obligations constituting accrued and unpaid interest on the Loans and fees, premiums and scheduled periodic payments, and any interest accrued thereon;

(c)      **Third**, to payment of that portion of the DIP Obligations constituting unpaid principal of the Loans; and

(d)      **Last**, the balance, if any, after all of the DIP Obligations have been indefeasibly paid in full, to the Borrowers, or as otherwise required by Law.

# ARTICLE X
# MISCELLANEOUS

**10.01**   **Amendments**

Unless otherwise provided in this Agreement (including, for the avoidance of doubt, provisions that permit or require the consent, approval, waiver, extension, satisfaction, determination, judgment, acceptance or similar action of the Lender), no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrowers therefrom, must be effective unless in writing signed by the Lender and the Borrowers, and each such waiver or consent must be effective only in the specific instance and for the specific purpose for which given.

**10.02**   **Notices and Other Communications; Facsimile Copies**

(a)   **Notices Generally**. All notices and other communications provided for herein must be in writing and must be delivered both (i) by hand or overnight courier service or mailed by certified or registered mail  and (ii) by electronic mail, each to the address specified in this Section 10.02. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, will be deemed to have been given when received (if by hand) or one day after being deposited with a courier for overnight delivery. Notices delivered through electronic communications to the extent provided in subsection (b) below will be effective as provided in such subsection (b).

**TO THE LENDER:**

> **BAR LOUIE LLC**
> Attn: Jeff Crivello
> 235 Walnut St.
> Libertyville, IL 60048
> Telephone: 847.651.2274
> Email: jeffcrivello@gmail.com
>
> *With Copies to:*
>
> Mette H. Kurth
> **PIERSON FERDINAND LLP**
> 3411 Silverside Road
> Baynard Building, Suite 104-13 Wilmington, Delaware 19810
> Telephone: (302) 907-9262
> Email: mette.kurth@pierferd.com
> mailto:lwarman@cm.law

TO THE BORROWERS:

> **BLH TOPCO LLC,**
> Attn:  Leslie Crook, CAO

15305 Dallas Parkway
12trh Floor
Addison, TX  75001

With Copies to:

Thomas J. Francella, Jr.
RAINES FELDMAN LITTRELL LLP
824 N. Market Street, Suite 805
Wilmington, DE  19801
Email:  tfrancella@raineslaw.com

(b)    **Electronic Communications**. The Borrowers or Lender may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them; provided that approval of such procedures may be limited to particular notices or communications. Notices and other communications sent to an e-mail address will be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication will be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    **Change of Address**. Each Borrower and the Lender may change its address or electronic mail address for notices and other communications hereunder by notice to the other Parties hereto.

(d)    **Reliance by Lender**. The Lender will be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers will indemnify the Lender and its Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Borrower, except for such losses caused by the Lender's or any of its Related Parties' gross negligence or willful misconduct. All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the Parties hereby consents to such recording.

## 10.03  <u>No Waiver; Cumulative Remedies</u>

(a)    No failure by the Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder will operate as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by Law.

10.04    **Expenses; Indemnity; Damage Waiver**

(a)        **Costs and Expenses**. Except as provided in the DIP Order, the Borrowers must pay, whether accrued or incurred prior to, on or after the Petition Date, (i) all out-of-pocket expenses (including reasonable and documented fees, disbursements and other charges of outside counsel, local counsel and financial advisors (collectively, the "**Lender Professionals**") and all Persons not regularly in its employ) incurred by the Lender in connection with this Agreement, the transactions contemplated hereby, and the Chapter 11 Cases, and (ii) all reasonable and documented out-of-pocket expenses (including fees, disbursements and other charges of counsel) of the Lender for enforcement costs and documentary taxes associated with this Agreement, the transactions contemplated hereby, and the Chapter 11 Cases.  Such costs and expenses will be added and capitalized to the outstanding principal balance of the Loans.

(b)        **Indemnification by the Borrowers**. The Borrowers hereby indemnify and defend the Lender and its Related Parties (each, an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of outside counsel for the Indemnitees, including one local counsel, as applicable, in any relevant jurisdiction and any specialty counsel, as applicable, for each relevant specialty and, in the case of actual or potential conflict of interest (as determined by such Indemnitee), separate counsel for Indemnitees to the extent needed to avoid such conflict), incurred by any Indemnitee or asserted against any Indemnitee arising out of, in connection with, or as a result of, (i) the execution or delivery of this Agreement or any other DIP Loan Document, the performance by the Parties of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of the DIP Loan Documents; (ii) any Loan or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged Release of Hazardous Materials at, on, under or from any assets owned, leased or operated by a Borrower, or any Environmental Liability related in any way to a Borrower or its respective facilities and/or assets; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity  not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the actual fraud, gross negligence, bad faith or willful misconduct of such Indemnitee.

(c)        **Waiver of Consequential Damages**. To the fullest extent permitted by applicable Law, the Borrowers hereto may not assert, and the  Borrowers hereby waive, any claim against the Lender or its Related Parties on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. The Lender and its Related Parties will not be liable for any damages arising from the use by unintended recipients of any information

or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the DIP Loan Documents or the transactions contemplated hereby or thereby so long as such Person is in compliance with Section 10.06 hereof.

(d)    **Payments**. All amounts due under this Section are payable not later than five Business Days after demand therefor.

(e)    **Survival**. The agreements in this Section 10.04 will survive the resignation or replacement of the Lender and the repayment, satisfaction, or discharge of all the DIP Obligations.

10.05  **Payments Set Aside**

To the extent that any payment by or on behalf of any Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other Person, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied will be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

10.06  **Successors and Assigns**

(a)    **Successors and Assigns Generally**. The provisions of the DIP Loan Documents are binding upon and inure to the benefit of the Parties and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder or thereunder without the prior written consent of the Lender, and the Lender may not assign or otherwise transfer any of its rights or obligations hereunder except (i) in accordance with the provisions of Section 10.06(b) or (ii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(d) (and any other attempted assignment or transfer by any Party, will be null and void). Nothing in this Agreement, expressed or implied, is to be construed to confer upon any Person (other than the Parties, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    **Assignments by Lender**. The Lender may at any time enter into an agreement assigning all of its rights and obligations under the DIP Loan Documents (including all or a portion of the Loans) (a "**Loan Assignment and Assumption**"). From and after the effective date specified in any Loan Assignment and Assumption Agreement, the assignee thereunder will be a party to this Agreement and, to the extent of the interest assigned by such Loan Assignment and Assumption Agreement, have the rights and obligations of the Lender under this Agreement to the extent of the interest assigned, and the Lender thereunder will, to the extent of the interest assigned by such Loan Assignment and Assumption Agreement, be released from its obligations under this Agreement (and, in the case of a Loan Assignment and

Assumption Agreement covering all of the Lender's rights and obligations under this Agreement, the assignee will become the Lender hereunder) and the Lender will cease to be a party hereto but will continue to be entitled to the benefits of Sections 3.01, 3.02, 9.04 and 10.04 with respect to facts and circumstances occurring before the effective date of such assignment. Upon request, the Borrowers (at their expense) will execute and deliver a Note to the assignee. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this subsection will be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations.

(c)     **Certain Pledges**. The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment will release Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such as a Party.

(d)     **Electronic Execution of Assignments**. The words "execution," "signed," "signature," and words of like import in any Loan Assignment and Assumption Agreement will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act and any state laws based on the Uniform Electronic Transactions Act.

10.07   **Setoff**

If an Event of Default occurs and is continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender or any such Affiliate to or for the credit or the account of the Borrowers against any and all of the obligations of the Borrowers now or hereafter existing under this Agreement or any other Loan Document to the Lender, irrespective of whether or not the Lender has made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers may be contingent or unmatured. The rights of the Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender or its Affiliates may have. The Lender agrees to notify the Borrowers promptly after any such setoff and application, provided that the failure to give such notice will not affect the validity of such setoff and application.

10.08   **Interest Rate Limitation**

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the DIP Loan Documents may not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If the Lender receives interest in an amount that exceeds the Maximum Rate, the excess interest will be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Lender exceeds the

Maximum Rate, the Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the DIP Obligations hereunder.

**10.09    Counterparts; Integration; Effectiveness**

This Agreement may be executed in counterparts (and by different Parties in different counterparts), each of which will constitute an original, but all of which when taken together will constitute a single contract. The DIP Loan Documents constitute the entire contract among the Parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article IV, this Agreement will become effective when executed by the Lender and when the Lender receives counterparts that, when taken together, bear the signatures of each of the other Parties. Delivery of an executed counterpart of a signature page of this Agreement by email will be effective as delivery of a manually executed counterpart of this Agreement.

**10.010    Survival of Representations and Warranties**

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith will survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of the making of any Loan and will continue in full force and effect as long as any Loan or any other Obligation hereunder will remain unpaid or unsatisfied.

**10.011    Severability**

If any provision of the DIP Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of the DIP Loan Documents will not be affected or impaired thereby, and (b) the Parties will endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

**10.012    GOVERNING LAW; JURISDICTION**

(a)    **GOVERNING LAW.** THIS AGREEMENT IS GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CHOICE-OF-LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF LAW OF ANOTHER JURISDICTION AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    **SUBMISSION TO JURISDICTION.** EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS

ASSETS, TO (I) THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING SUCH JURISDICTION, TO (II) THE NONEXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING WILL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT WILL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ITS ASSETS IN THE COURTS OF ANY JURISDICTION.

(c)     **WAIVER OF VENUE.** EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     **SERVICE OF PROCESS.** EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.013 **WAIVER OF RIGHT TO TRIAL BY JURY**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER

AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THE DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 10.014 **USA Patriot Act Notice**

The Lender hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow the Lender to identify the Borrowers in accordance with the Patriot Act.

### 10.015 **No Advisory or Fiduciary Relationship**

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other DIP Loan Document), each Borrower acknowledges and agrees that: (a)(i) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between the Borrowers, on the one hand, and the Lender, on the other hand, (ii) the Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) the Borrowers are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the DIP Loan Documents; (b)(i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the Parties, has not been, is not and will not be acting as an advisor, agent or fiduciary, for the Borrowers and (ii) the Lender has no obligation to the Borrowers with respect to the transactions contemplated hereby, except those obligations expressly set forth in the DIP Loan Documents to which it is a party; and (c) the Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, and the Lender has no obligation to disclose any of such interests to the Borrowers. To the fullest extent permitted by Law, the Borrowers hereby waive and release any claims that they may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

### 10.016 **Conflict**

In the event of a conflict between this Agreement and the DIP Order, the DIP Order will govern.

### 10.017 **Release**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Borrowers hereby, for itself and its successors and assigns, fully and without reserve, releases acquits, and forever discharges Lender, its successors and assigns, officers, directors, employees, representatives, trustees, attorneys, agents and affiliates (collectively, the "**Released Parties**" and each individually a "**Released Party**") from any and all actions, claims, demands, causes of action, judgments, executions, suits, debs, liabilities, costs, damages, expenses or other obligations of any kind and nature whatsoever, direct and/or indirect, at law or in equity, whether now existing or hereafter asserted, whether absolute or contingent, whether due or to become due, whether disputed or undisputed, whether known or unknown, for or

because of any matters or things occurring, existing or actions done, omitted to be done, or suffered to be done by any of the Released Parties, in each case, on or prior to the date hereof and are in any way directly or indirectly arising out of this Agreement, any other DIP Loan Document, the Prepetition Credit Agreement, the Prepetition Obligations, any other Loan Document (as defined in the Prepetition Credit Agreement), any of the Chapter 11 Cases, the DIP Order or any of the other orders, documents, or other matters related thereto, or any of the transactions contemplated hereby or thereby (collectively, the "**Released Claims**").  Each Borrower agrees that it will not sue any Released Party on the basis of any Released Claim.  The provisions of this Section 10.017 will survive the termination of the DIP Loan Documents and the payment in full of the DIP Obligations.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be  duly executed as of the date first above written.

**BORROWER:**

**BLH TOPCO LLC**

By:  _____
Name: _____
Title: _____

**BLH HOLDCO LLC**

By:  _____
Name: _____
Title: _____

**BLH ACQUISITION CO., LLC.**

By:  _____
Name: _____
Title: _____

**BLH RESTAURANT FRANCHISES LLC**

By:  _____
Name: _____
Title: _____

**LENDER:**                          **BLH WHITE MARSH LLC**

**BAR LOUIE LLC**

By: _____
Name: _____
Title: _____

By: _____
Name: Jeff Crivello
Title:  President

**EXHIBIT A:  BORROWING REQUEST FORM**

**BORROWING REQUEST**

Date: [_____], 2025

Lender: Bar Louie LLC

Dear Mr. Crivello:

This Borrowing request is furnished under Section 2.02 of the *Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement* dated as of March 226, 2025 (as amended, restated, supplemented, renewed or otherwise modified, the "**Agreement**") among BLH Topco LLC, BLH Holdco LLC, BLH Acquisition CO., LLC, BLH Restaurant Franchises LLC, and BLH White Marsh LLC, as Borrowers, and Bar Louie LLC, as Lender. Unless otherwise defined herein, capitalized terms used in this Borrowing request have the meanings set forth in the Agreement.

The Borrowers requests the following Borrowing:

    (1) Borrowing Date (*must be a Business Day*): _____

    (2) Amount Requested: $ _____

    (3) Account to be Credited (last 4 digits): _____

The Borrowers represent that as of the date of this Borrowing request:

    (1) **Budget Compliance.** The Borrowers are in compliance with the then-current Budget, taking into account the variances permitted under Section 8.04, and have used all Borrowings in compliance with the covenants set forth in Sections 7.09 and 8.05.

    (2) **Milestones.** All Milestones in Section 7.01 of the Agreement have been met.

    (3) **No Default.** There is no Default or Event of Default under the Agreement.

                    **BLH TOPCO LLC**
                     **BLH HOLDCO LLC**
                     **BLH ACQUISITION CO., LLC**
                     **BLH RESTAURANT FRANCHISES LLC**
                     **BLH WHITE MARSH LLC**

                     By: _____
                     Name: _____
                     Title: _____

**EXHIBIT B:  BUDGET**

**Bar Louie - DIP Budget**
**Thirteen Week Cash Flow Forecast**
*($ in 000's)*

| Forecast Week # | 1 - b | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13-week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| FY Week # | 13 - b | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 13-week |
| Week Start | 3/27/2025 | 3/31/2025 | 4/7/2025 | 4/14/2025 | 4/21/2025 | 4/28/2025 | 5/5/2025 | 5/12/2025 | 5/19/2025 | 5/26/2025 | 6/2/2025 | 6/9/2025 | 6/16/2025 | 3/27/2025 |
| Week End | 3/30/2025 | 4/6/2025 | 4/13/2025 | 4/20/2025 | 4/27/2025 | 5/4/2025 | 5/11/2025 | 5/18/2025 | 5/25/2025 | 6/1/2025 | 6/8/2025 | 6/15/2025 | 6/22/2025 | 6/22/2025 |
| **Current Week Restaurant Sales** | 1,375 | 1,991 | 1,971 | 1,975 | 1,908 | 2,132 | 2,119 | 1,942 | 1,900 | 1,905 | 1,855 | 1,860 | 1,881 | 25,391 |
| Company Owned Stores | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 |
| SSS % vs 2024 | N/A | -4.3% | -3.4% | -1.9% | -9.8% | 7.3% | 2.1% | -5.3% | -7.2% | -5.6% | -10.5% | -9.7% | -4.4% | |
| **Inflows** | | | | | | | | | | | | | | |
| Operating Receipts | 1,472 | 1,992 | 1,990 | 1,986 | 1,940 | 2,079 | 2,137 | 2,007 | 1,924 | 1,915 | 1,881 | 1,869 | 1,885 | 25,692 |
| Sales Tax Receipts | 123 | 166 | 166 | 166 | 162 | 174 | 179 | 168 | 160 | 160 | 157 | 156 | 157 | 2,144 |
| Other Receipts | 105 | 112 | 47 | 52 | 52 | 52 | 149 | 112 | 52 | 52 | 52 | 52 | 52 | 980 |
| **Total Cash Inflows** | $1,700 | $2,269 | $2,202 | $2,203 | $2,153 | $2,401 | $2,427 | $2,226 | $2,136 | $2,126 | $2,089 | $2,076 | $2,094 | $28,816 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| COGS Vendors | - | (580) | (624) | (614) | (527) | (538) | (533) | (534) | (516) | (576) | (573) | (525) | (514) | (7,399) |
| Payroll & Payroll Taxes | - | (724) | (737) | (820) | (731) | (710) | (781) | (777) | (811) | (708) | (709) | (694) | (785) | (9,978) |
| Bar Operating Expenses | - | (421) | (416) | (415) | (418) | (412) | (413) | (416) | (419) | (419) | (412) | (413) | (412) | (5,398) |
| Utilities | - | (40) | (40) | (40) | (40) | (39) | (39) | (40) | (40) | (40) | (39) | (39) | (39) | (514) |
| Marketing | - | (33) | (33) | (33) | (33) | (32) | (33) | (33) | (33) | (33) | (32) | (33) | (32) | (425) |
| G&A Expenses | - | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (30) | (30) | (30) | (328) |
| Rent and Facilities Expense | - | (944) | - | - | - | (944) | - | - | - | - | (629) | (315) | - | (2,956) |
| Insurance | - | (120) | (5) | (5) | (5) | (85) | (5) | (5) | (5) | (108) | (5) | (5) | (5) | (363) |
| Sales Tax Disbursements | - | (6) | (6) | (6) | (667) | (5) | (6) | (6) | (666) | (6) | (5) | (6) | (235) | (1,781) |
| Other Operating Disbursements | - | (30) | (85) | (30) | (30) | (30) | (30) | (4) | (4) | (4) | (4) | (4) | (4) | (289) |
| **Total Operating Disbursements** | - | ($2,921) | ($1,968) | ($1,986) | ($2,476) | ($2,820) | ($1,863) | ($1,837) | ($2,518) | ($1,918) | ($2,440) | ($2,062) | ($2,056) | ($29,430) |
| **Cash Flow From Operations** | $1,700 | ($651) | $234 | $218 | ($323) | ($419) | $564 | $389 | ($382) | $208 | ($351) | $14 | $37 | ($615) |
| **Cummlative Cash Flow From Operations** | ($153) | ($805) | ($571) | ($353) | ($676) | ($1,094) | ($530) | ($141) | ($523) | ($315) | ($666) | ($652) | ($615) | ($615) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Utility Deposits | - | - | (122) | - | - | - | - | - | - | - | - | - | - | (122) |
| 503(b)(9) Payments Paid in ordinary course (included in A/P) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PACA Provision Paid in ordinary course (included in A/P) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Restructuring Disbursements** | - | - | ($122) | - | - | - | - | - | - | - | - | - | - | ($122) |
| **Restructuring Professionals** | | | | | | | | | | | | | | |
| Debtor Counsel Raines Feldman Littrell LLP | | | - | | | | (100) | | | (100) | | - | | (240) |
| Lender Counsel Pierson Ferdinand | | | | | | | (50) | | | (50) | | | | (200) |
| Committee Professionals | | | (50) | | | | | | | | | | | (50) |
| Claims Agent - Stretto | | | (50) | | - | | (100) | | | | (50) | | | (200) |
| United State Trustee | | | | | | | | | | | | (50) | | (100) |
| Independent Manager | | | | (15) | | | | (15) | | | | (15) | | (45) |
| **Total Restructuring Professionals** | - | - | ($100) | ($15) | - | - | ($250) | ($15) | - | ($250) | - | ($65) | - | ($835) |
| **DIP Draw** | | 1,350 | | | | | | | | | | | | 1,500 |
| **Net Cash Flow** | $1,700 | $699 | $12 | $203 | ($323) | ($419) | $314 | $374 | ($382) | ($42) | ($351) | ($51) | $37 | ($72) |
| **Beginning Cash balance** | ($1,586) | $115 | $813 | $825 | $1,028 | $705 | $286 | $601 | $975 | $593 | $551 | $200 | $149 | $186 |
| **Ending Cash Balance** | $115 | $813 | $825 | $1,028 | $705 | $286 | $601 | $975 | $593 | $551 | $200 | $149 | $186 | $115 |