# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLH TOPCO LLC, *et al.*,[1] | Case No. 25-10576 (CTG) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF LESLIE CROOK IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Leslie Crook, hereby declare as follows:

1. I serve as the Chief Administrative Officer ("**CAO**") of the debtors and debtors in possession (the "**Debtors**") in the above-captioned bankruptcy cases (these "**Cases**"). The Debtors operate and franchise locally themed, social gastrobars under the "Bar Louie" brand (collectively, "**Bar Louie**"). I submit this declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on March 26, 2025 (the "**Petition Date**") and the relief requested pursuant to the Debtors' applications and motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

2. I have substantial experience providing interim management, turnaround consulting, financial advisory, and consulting services for middle market companies and their lenders or investors. I have served as President of a chain of 85 restaurants, Chief Strategy Officer, Chief Information Officer, director, and turnaround advisor in various industries. On February 19, 2025, I was appointed as CAO to provide interim management, process improvement and turnaround advisory services.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: BLH TopCo LLC (9009); BLH HoldCo LLC (7735); BLH Acquisition Co., LLC (5779); BLH Restaurant Franchises LLC (8093); and BLH White Marsh LLC (2950). The Debtors' mailing address is 15305 Dallas Parkway, 12th Floor, Addison, TX 75001.

3. I am familiar with the Debtors' operations, business affairs and circumstances leading to these Cases. Unless otherwise indicated, all facts set forth in this declaration are based on (a) my personal knowledge of the Debtors' business operations and finances or my review of relevant documents, (b) information received from persons working under my supervision or direction, the Debtors' management team, or the Debtors' advisors, and/or (c) my opinion based upon my experience as a restaurant executive and management and turnaround consultant. If called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

4. Bar Louie is an upscale neighborhood bar and eatery known for a relaxed atmosphere, handcrafted cocktails, a well curated selection of local and regional beers, high quality wines, and a robust menu. The Bar Louie concept centers on locally themed bars that cater to the specific demographics within each neighborhood location. Founded in 1991 in Chicago, Illinois, the Debtors operate 31 locations, franchise another 17 locations, and employ approximately 1,400 persons across 19 states. Bar Louie restaurants are located in a variety of locations, including lifestyle centers, traditional shopping malls, event locations, central business districts and other stand-alone specialty sites.

5. The Debtors acquired the Bar Louie business in May 2020 through a section 363 sale process in a prior bankruptcy proceeding.[2] However, despite strong progress after the reduction of pandemic-era restrictions, the Debtors have continued to struggle in the face of various financial and operational challenges, including a number of underperforming locations, increased costs of operation, and mounting macroeconomic pressures.

---

[2] These prior cases were commenced in this district on January 27, 2020, and jointly administered under the caption *In re BL Restaurants Holding, LLC*, Case No. 20-10156 (CTG) (collectively, the "**Prior Cases**").

6. After an unsuccessful prepetition marketing process and substantial prepetition operational restructuring efforts, the Debtors commenced these Cases to effect a comprehensive reorganization to be implemented through a chapter 11 plan that will result in a substantial deleveraging of the Debtors' balance sheet. The Debtors believe that the contemplated reorganization will deliver a value-maximizing result for their estates, creditors and other stakeholders.

## CORPORATE AND CAPITAL STRUCTURE

7. As shown on the Corporate Organizational Court attached as **Exhibit A**, Debtor BLH TopCo LLC ("**TopCo**") owns 100% of the membership interests of debtor BLH Holdco LLC ("**HoldCo**"), which, in turn owns 100% of the membership interests of BLH Acquisition Co., LLC ("**BLH Acquisition**"), which in turn owns 100% of the membership interests of (both) BLH Franchises Restaurants LLC ("**Franchises**") and BLH White Marsh LLC ("**White Marsh**"). TopCo, HoldCo, BLH Acquisition and Franchises are all Delaware limited liability companies. White Marsh is a Maryland limited liability company. Nondebtor Bar Louie Restaurant Group LLC owns 100% of the membership interests of TopCo.

8. BLH Acquisition, Holdco, and Franchises are obligors under the *Credit Agreement* dated as of May 27, 2020 (as amended and restated from time to time, the "**Prepetition Credit Agreement**") with Bar Louie LLC (the "**Lender**"), as successor administrative agent and successor lender. As of the Petition Date, BLH Acquisition, Holdco, and Franchises, are indebted under the Prepetition Credit Agreement in the amount of not less than $69,982,865.97, plus additional fees, expenses, and other amounts arising under the Prepetition Credit Agreement. The obligations of BLH Acquisition, Holdco, and Franchises under the Prepetition Credit Agreement are secured by senior security interests in and liens on substantially all of their assets, constituting

substantially all of the Debtors' assets. The Lender acquired the agent and lender positions under the Prepetition Credit Agreement from the prior holders on or about February 18, 2025.

## EVENTS LEADING TO THESE CASES

9. Despite positive results since the cessation of COVID-related restrictions, the Debtors have been adversely affected by significant macroeconomic factors that have placed imposed negative pressure on the Company's margins and cash flow. Inflationary pressures have caused consumers, generally, to cut back on dining out. At the same time, menu prices have risen to keep pace with increased food, utility and labor costs. As a result, many of the Debtors' restaurants have underperformed, causing a drag on the Debtors' financial performance and management attention.

10. Among other metrics evidencing the Debtors' financial challenges, Bar-level EBITDA for November 2024 was 38.8% less than the same period in 2023. As of December 1, 2024, year-to-date EBITDA was approximately 9% less than the same period in 2023.

11. From June 2024 through February 2025, the Debtors employed Kroll Securities to lead a marketing process to procure a sale of all or certain parts of their businesses. The process was unsuccessful. Throughout their diligent marketing efforts, the Debtors worked to address their business challenges to restore operating margins. Over the past two years, such efforts have included price changes, promotions based on data-driven marketing and customer analysis, and creative measures to lower the cost of goods sold and an analysis of underperforming locations.

12. As the Debtors' liquidity continues to deteriorate, commencing these Cases is necessary to preserve the value of the Debtors' assets and maximize their going concern value. In light of these factors and the need to take immediate action to preserve value, the Debtors' management considered and ultimately authorized the Debtors to seek bankruptcy protection. The

Debtors, with the assistance of their advisors, are focused on preserving cash, improving cash flow, and moving these Cases forward expeditiously so that the value of these businesses can be maximized for the benefit of the Debtors' estates.

13. Through these Cases, the Debtors will implement their right-sizing plan, including closing, at least, 13 corporate-owned and operated locations.[3] With their new footprint, the Debtors will be better equipped to retain and grow market share in areas with strong performance and brand success. In addition to the cost savings from location closures, the Debtors expect performance improvements for retained locations from lease concessions and contract renegotiations, as well as from customer migration from closed locations. With the protection of the Court, the Debtors will continue the process they started pre-petition of improving cash flow, streamlining operations, and reshaping the Debtors' footprint and operations for growth.

## CURRENT LEADERSHIP

14. The Debtors' sole director is Teri Stratton. Ms. Stratton has more than twenty years' experience in financial advisory and investment banking services and has been involved in numerous financial and operational restructurings, valuations, solvency analyses, fraudulent transfer disputes, investment banking and corporate finance transactions, and troubled company due diligence investigations. Ms. Stratton has represented debtors or creditors' committees in a significant number of cases including *In re Red Lobster Mgmt., LLC,* No. 24-02486 (GER) (M.D. Fla. May 19, 2024); *In re MusclePharm Corp.*, No. 22-14422 (NMC) (Bankr. D. Nev. Aug. 28, 2023); *In re Meridian Restaurants Unlimited, LC*, No. 23-20731 (JTM) (Bankr. D. Uta. Aug. 1, 2023); *In re CBC Restaurant Corp.*, No. 23-10245 (KBO) (Bankr. D. Del. June 2, 2023); *In re CiCi's Holdings, Inc.*, No. 21-30155 (SGJ) (Bankr. N.D. Tex. Mar. 1, 2021); *In re VIVUS, Inc.*,

---

[3] The lease for each corporate-owned and operated location resides with BLH Acquisition. The Debtors do not own any real estate; all restaurant locations are leased.

No. 20-11779 (LSS) (Bankr. D. Del. Jul. 7, 2020); and *In re Garden Fresh Restaurant Corporation*, No. 20-02477 (JLS) (Bankr. S.D. Cal. May 14, 2020).

15.  The Debtors' Chief Executive Officer, Brian Wright, has decades of experience in restaurant operations. Earlier this year, Ms. Stratton appointed me as Chief Administrative Officer to oversee the Debtors' operations. Additionally, I am the sole shareholder of the holding company.

## NEED FOR POSTPETITION FINANCING

16.  Without post-petition financing, the Debtors' lack the cash to implement their contemplated reorganization through these Cases. The Debtors require new funding to ensure sufficient working capital to operate their businesses, preserve and maximize the value of their estates, administer their estates, and confirm and implement a chapter 11 plan. The Debtors' liquidity needs include payments to employees, third-party vendors, landlords, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets. Accordingly, the Debtors have sought debtor-in-possession loans from various parties and, contemporaneous herewith, have sought the Court's permission to enter into a $2,475,000 debtor-in-possession financing facility with consensual use of cash collateral (as further described herein, the "DIP Facility").

17.  Before commencing these Cases, the Debtors solicited third-party lenders for postpetition financing to assess the availability of such financing and confirm appropriate terms for the Debtors to continue to operate and administer these Cases. This process did not result in any actionable alternative sources of post-petition financing. I am unaware of any third party (other than the Lender) willing to provide the Debtors the financing necessary to continue to operate and to administer these Cases and to do so on terms that are more beneficial to the Debtors and their estates.

18. The Debtors have committed to a tight timeline toward an effective date of a confirmed chapter 11 plan. The milestones agreed to by the Debtors, and sought for approval in the DIP Motion, are as follows:

- within 5 days of the Petition Date, the Debtors must obtain entry the Interim DIP Order, in form set forth in the DIP Motion;

- within 28 days of the Petition Date, the Debtors must file a plan and disclosure statement acceptable to the Lender in its sole discretion;

- within 90 days of the Petition Date, the Debtors must obtain entry of an order, in form and substance acceptable to Lender confirming a chapter 11 plan; and

- within 120 days of the Petition Date, the effective date of a plan must occur.

19. I have worked with the Debtors to prepare a budget for operating and other administrative expenditures during the short timespan of these Cases, which is attached to the DIP Motion (as defined herein). I am familiar with the budget and its contents. As described in the DIP Motion, the Debtors require approximately $1.35 million of new funding so that the Debtors can operate their businesses and restructure through a chapter 11 plan. I believe the budget is fair, reasonable, and appropriate under the circumstances.

20. In my opinion, the currently contemplated DIP Facility, will provide the Debtors with necessary and sufficient capital to (a) avoid irreparable harm to the Debtors' estates; (b) operate throughout these Cases; and (c) provide the Debtors with sufficient runway to achieve confirmation and implementation of their contemplated chapter 11 plan. The DIP Facility is needed to assure customers, employees, landlords, and vendors that these Cases are sufficiently funded and that post-petition expenses can and will be paid. Additionally, the DIP Facility will provide the Debtors with continued access to cash collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. The DIP Facility is also critical to preserving going concern value and moving these Cases toward a confirmed chapter 11 plan.

21. I believe that the DIP Facility is the product of good faith, arms-length, vigorous negotiation among the Debtors and the Lender, and their respective counsel and advisors. Without access to additional funding and the continued use of cash collateral as contemplated under the DIP Facility, the Debtors would suffer immediate and irreparable harm, and the Debtors' operations will deteriorate, eventually forcing a liquidation.

## THE FIRST DAY MOTIONS

22. Contemporaneously with the filing of this Declaration, the Debtors have filed or will file the First Day Motions to minimize the disruption and adverse effects of the commencement of the Cases on the Debtors' operations and to preserve value for their estates and all stakeholders.

23. The First Day Motions are:

   a. **Joint Administration**. *Debtors' Motion for Entry of Order Directing Joint Administration of Related Cases and Granting Related Relief*;

   b. **Creditor Matrix.** *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated (A) Creditor Matrix; and (B) Top 30 Creditors List; (II) Authorizing Redaction of Certain Personal Identification Information; and (III) Granting Related Relief*;

   c. **Cash Management.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue Certain Intercompany Transactions; and (II) Granting Related Relief*;

   d. **Utilities.** *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors, (B) Approving the Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, and (C) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (II) Granting Related Relief*;

   e. **Insurance.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Continue Their Insurance Policies and*

> *Premium Financing Arrangements and (B) Honor All Obligations with Respect Thereto; and (II) Granting Related Relief;*
>
> f. **Employee Obligations.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Employee Benefits Obligations and Other Compensation, (B) Continue Employee Benefits Programs and Payment of Related Administrative Obligations; and (II) Granting Related Relief;*
>
> g. **Taxes.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Sales, Use, and Other Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, and Honor and Pay Checks Issued and Electronic Payment Requests Made Related to Such Taxes and Fees;*
>
> h. **Claims & Noticing Agent.** *Debtors' Application for Appointment of Stretto as Claims and Noticing Agent;*
>
> i. **Critical Vendors.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Section 503(b)(9) Claims and PACA/PASA Claims, and Granting Related Relief;*
>
> j. **Customer Programs.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business and Granting Related Relief;* and
>
> k. **Lease Rejection.** *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases and (B) `Abandonment of Certain Personal Property In Connection Therewith, Each Effective as of the Petition Date; and (II) Granting Certain Related Relief* (the "<u>Lease Rejection Motion</u>")*;*

24. The First Day Motions request authority to, among other things, enter into the DIP Financing, honor workforce-related compensation and benefits obligations, pay claims of certain critical vendors, suppliers, and taxing authorities, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Cases. For the avoidance of doubt, the Debtors request authority, but not direction, to incur indebtedness, pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

25. The Lease Rejection Motion requests authority to (a) reject certain Leases (as defined in the Lease Rejection Motion) and (b) abandon certain Personal Property (as defined in the Lease Rejection Motion) with such rejection and abandonment effective as of the Petition Date. Each "Lease" is for a restaurant location determined to be burdensome or a restaurant determined to be underperforming or unprofitable. For each of the Leases, the Debtors ceased operations and vacated the premises and gave notice of surrender to the applicable landlord and provided keys or codes, as applicable, prior to the Petition Date. The Debtors have determined that the costs of the Leases outweigh any marginal benefits that could possibly be achieved from assignments or subleases of the Leases (to the extent permitted by the terms thereunder). Moreover, the Debtors have evaluated the personal property at each location and have determined that (a) it is of inconsequential value or (b) the cost of removing and storing such personal property for future use, marketing, or sale exceeds the value of the personal property to the Debtors' estates. Accordingly, and as further detailed in the Lease Rejection Motion, the Debtors believe that the rejection of the Leases and the abandonment of the Personal Property as of the Petition Date is appropriate and in the best interests of the Debtors, their estates, and their creditors.

26. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and the facts set forth in the First Day Motions are incorporated herein by reference. To the best of my knowledge, the facts set forth in the First Day Motions are true and correct, and if called upon to testify, I could and would testify competently to such facts.

27. As described in the First Day Motions, I believe that the Debtors' requests for interim relief are narrowly tailored, or where the requested payments would otherwise be entitled to priority over general unsecured claims under the Bankruptcy Code. It is my opinion that the relief sought in the First Day Motions is essential to avoid irreparable harm and to allow the

Debtors to operate without disruptions, as well as to preserve the value of the Debtors' estates, and is in the best interests of the Debtors' estates, creditors and other stakeholders.

## **CONCLUSION**

28. For the reasons described herein and in the First Day Motions, I believe that the relief requested in the First Day Motions should be granted by the Court, with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 27, 2025                    */s/ Leslie Crook*
                                               Leslie Crook
                                               Chief Administrative Officer of the Debtors